[No. D039114. Fourth Dist., Div. One. Apr. 29, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD ARTHUR WEAVER, Defendant and Appellant.

**COUNSEL**

Ronald Arthur Weaver, in pro. per.; Diane Nichols, under appointment by the Court of Appeal; William R. Salisbury for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BENKE, Acting P. J.**—Ronald Arthur Weaver pleaded guilty to four counts of lewd acts upon a child and six counts of attempted lewd acts upon a child. Weaver was sentenced to a prison term of 18 years. He appeals, arguing the trial court abused its discretion in denying his request to withdraw his guilty plea and that one of the attempted lewd act counts was barred by the statute of limitations.

FACTS

A. *Alyssa R.*

On July 14, 2000, five-year-old Alyssa R. was at her grandmother's house. When Alyssa's mother arrived to pick her up, she noticed Alyssa sitting on appellant's lap at a computer. Both Alyssa's mother and grandmother noted that appellant, a family friend, had his right hand on Alyssa's upper thigh. Alyssa's mother told her to get off appellant's lap. While driving home, Alyssa's mother asked her about her day. Alyssa told her appellant had touched her and pointed to her vagina. Alyssa's mother asked if appellant was wiping something from her dress. Alyssa said, no, that he "tickle[d]" her, "rub[bed] her bump," and sometimes touched her under her underwear. Alyssa's mother dropped her off at home and returned to grandmother's house to confront appellant. Alyssa's mother repeatedly asked appellant if he had touched Alyssa as she described. Eventually, appellant stated he had touched her thigh and "guessed" he was guilty until proven innocent.

In the past, on at least three occasions Alyssa's mother saw appellant kiss Alyssa on the lips while playing the "Sleeping Beauty" game. On six or seven occasions she came home to find appellant sleeping with Alyssa on a bed. On one occasion the two were clothed but under the bedcovers. On one occasion she noticed appellant staring at Alyssa while she slept.

Alyssa's grandmother believed in the year before the July 14, 2000, incident appellant had taken an "obsessive" interest in Alyssa. Appellant would call Alyssa's grandmother to see if the child was there. When appellant visited the residence, he would always play with Alyssa. On one occasion Alyssa's grandmother found appellant and the child sleeping together with appellant "draped" over Alyssa. Alyssa's grandmother told appellant this was inappropriate behavior.

On July 14, 2000, appellant, Alyssa and her grandmother went to dinner. On their return home, Alyssa went to a friend's house. Appellant volunteered to take grandmother's dog for a walk. About 45 minutes later Alyssa "burst"

into her grandmother's house, shut the blinds and turned out the lights. She appeared to be frightened. Alyssa explained to her grandmother that appellant came to her friend's house and took her with him to walk the dog. As Alyssa started to further explain events, appellant came into the house. Later, Alyssa's grandmother heard appellant say to the child: "It will be our little secret." Alyssa replied: "I won't tell anyone."

Alyssa was interviewed by police officers. She told them appellant did something bad to her and described him as a "weirdo." She stated appellant touched her with his fingers and tongue. When asked where, she pointed to her anal and genital areas. Alyssa stated appellant began touching her when she was four years old and had touched her on numerous occasions. Appellant told Alyssa to tell no one because they did not want to get caught.

Appellant spoke to detectives and denied molesting Alyssa. Asked about the Sleeping Beauty game, he stated it was Alyssa's idea and they had only played the game once.

### B. *Natalie T.*

In March 1999 the mother of Natalie T. reported to child protective services that appellant, a family friend, had touched the child's vaginal area with his hands on numerous occasions. The abuse occurred when Natalie was between six and nine years of age. Appellant was interviewed regarding the allegation and denied any wrongdoing. Natalie T.'s parents believed her emotional condition too delicate to participate in a prosecution of appellant and the case was closed. After the report that appellant had molested Alyssa, Natalie's parents were asked if the child was then able to participate in a prosecution of appellant. They concluded that she was.

## DISCUSSION

Appellant argues the trial court erred in not allowing him to withdraw his plea of guilty. He contends that as a result of pressure from his attorneys and the trial court, as a result of the trial court's over-involvement in plea negotiations and the court's apparent bias against him, he entered a plea under duress. Appellant argues the trial court should have allowed him to withdraw the plea and go to trial.

### A. *Background*

On February 1, 2001, an information was filed charging appellant with five counts of lewd acts on a child with regard to Alyssa R. and four counts of that offense with regard to Natalie T.

Appellant posted bail of $50,000.

On March 7, 2001, retained counsel Thomas Matthews filed a severance motion asking that the counts involving Alyssa R. be tried separately from the counts involving Natalie T. He also filed a motion to dismiss pursuant to Penal Code[1] section 995.

On May 31, 2001, the prosecution filed a motion asking that appellant's bail be raised from $50,000 to $250,000. The motion noted that on April 24, 2001, appellant's computer was seized pursuant to a search warrant. On the computer were found 1,850 images that appeared to be young children involved in sexually explicit positions or activities. Also found on the computer were "bookmarks" for websites dealing with pedophilia. The prosecution argued such material indicated appellant was a dangerous pedophile and had committed an additional crime by being in possession of child pornography. The motion also noted the intention of the prosecution to amend the information to allege circumstances, i.e., multiple victims, that would make appellant eligible for a term of 15 years to life pursuant to section 667.61, subdivisions (b), (c), and (e).

On April 3, 2001, appellant's section 995 motion was denied.

On June 1, 2001, the case was assigned to Judge Frank Brown. At a hearing on that date the court asked the status of plea bargaining. The prosecutor stated appellant was unwilling to accept a lengthy stipulated prison term and it appeared the case would go to trial. The court stated that was fine but noted that in the last case he tried, an offer was made of six to eight years in prison. The offer was refused. The defendant was convicted and sentenced to a term of 25 years to life. The trial court noted the potential sentence in appellant's case was very severe. The judge noted appellant's alleged acts were predatory. The court also expressed concern about requiring the victims to testify.

After a discussion about the images found on appellant's computer, the court stated that "off the cuff" it appeared appellant was a pedophile. The court stated that some sentence short of 15 years to life would be fair. The court noted appellant had no record and asked the prosecutor to be reasonable in offering a plea bargain. The court stated this was not a case in which probation would be granted. The court stated that once it and a jury saw the victims "and we take all this ugliness and put it out on the table and put it out there it's a lot different than right now where we're all adults sitting here dispassionately." The court continued: "As soon as the first little girl in

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

the pink dress sits down, you know, then you're going to see the real victim. You'll see the real impact." The court stated it would not be pretty.

The court stated based on its experience, it was much better to resolve cases of this type before trial. The court told the parties they had to be realistic. The court stated: "What I'm trying to say is it's better if we handle this than letting the jury handle it." The court stated that while there was some "reasonable likelihood [appellant's] going to prevail," he was "taking a big risk." The trial court cited specific examples of defendants refusing reasonable bargains, going to trial, and receiving sentences longer than were offered before trial. The court noted that once a jury reached a verdict, the court's discretion in sentencing would be more limited. The court stated that in cases of this type juries and judges often act emotionally.

The judge stated he was very experienced and did not get emotional. The court then noted that a trial might have a lasting impact on the victims. The court stated it wanted the matter of a plea agreement fully explored. The court stated it did not want to see the girls "victimized" again. The court observed that most of the time when cases go to trial, the prosecution gets happier. The court stated that was not always the case. The court noted defendants were sometimes acquitted.

After argument on the matter the trial court raised appellant's bail from $50,000 to $250,000, noting that appellant was a pilot who owned his own airplane and was facing extremely serious charges.

On June 20, 2001, a hearing was held on appellant's motion to reduce bail. The trial court refused the request, noting again its conclusion that appellant was a flight risk and noting further its conclusion that given the child pornography found on appellant's computer, he was a danger to the community. In response to the court's comments concerning the computer material, defense counsel argued, as he had at the earlier bail hearing, that appellant downloaded the material only after his arrest as part of his research concerning pedophilia. Counsel argued its presence on appellant's computer did not, therefore, indicate that he was dangerous.

At a status conference on June 28, 2001, the trial court strongly encouraged the parties to reach a settlement.

On July 25, 2001, at a hearing on in limine motions, Kerry Steigerwalt joined Thomas Matthews as cocounsel. The court heard and took under submission appellant's motion to sever the counts dealing with Alyssa R. from those dealing with Natalie T. At the end of the hearing the trial court again encouraged the parties to resolve the matter. The court suggested that

the charged conduct was not as serious as in some molestation cases and asked the parties to provide him with some agreed-upon sentence range. The court stated if he were a defense attorney he would not want to try appellant's case, and if he were a prosecutor he would be happy to try it. The court stated: "But on the other hand, on the other hand, I don't want to put these little girls through this stuff. If they go through it, and you win, that's fine. The D.A.'s happy we won a case; those girls were sacrificed." The court stated if the defense were able to create some reasonable doubt and the jury was hung, they might have to retry the case. The court ended by saying: "Let's put an end to this if we can. If we can't, we'll just try it until they reach a verdict or until one side quits."

A further hearing on in limine motions was held on August 1, 2001. The trial court began by denying appellant's severance motion. The court then asked if there was any progress on reaching a plea bargain. Mr. Steigerwald stated he had discussed the matter at length with appellant and no bargain could be reached. The court stated that was fine and the matter would not be discussed again.

The court then heard argument concerning the prosecution's request to offer in evidence images of child pornography taken from appellant's computer as well as other matters. Defense counsel argued the images taken from appellant's computer were protected by the attorney-client privilege and were inadmissible. He noted that all of the images were downloaded to appellant's computer after his arrest. He stated the images were downloaded as part of the preparation of appellant's case. The trial court stated the explanation was unbelievable. Counsel argued that every image found on appellant's computer was attached to an article concerning child pornography and was download as research. Counsel also argued the evidence was irrelevant and in any case should be excluded under Evidence Code section 352 as more prejudicial than probative.

While not entirely clear from the record, it appears the prosecution was prepared to offer the testimony of two other girls who claimed appellant molested them. Defense counsel opposed the admission of their testimony. Counsel also argued that the prosecution should be foreclosed from offering evidence concerning appellant's noncharged behavior with the victims, e.g., the Sleeping Beauty game.

During the discussion of these issues, the trial judge stated appellant's noncharged behavior with the victims was highly probative and would be admitted. The court stated it would probably admit the testimony of the additional victims and would probably allow admission of some of the images from appellant's computer. The court stated the child pornography on

appellant's computer and his behavior with the victims showed he was a pedophile and that he was in denial. The trial court opined that in view of the evidence, appellant was going to be convicted.

With regard to the computer images, the trial court suggested the prosecution choose 12 of the most egregious and the defense choose 12 of the most innocuous and they would be admitted. Defense counsel replied that if the images were admitted, the jury would not have to deliberate to find appellant guilty. The court stated: "That's what I've tried to tell you, Mr. Steigerwalt. Your client's probably a pedophile." The court then described the pictures for the record. Counsel stated the pictures were "lethal." The court agreed and stated they were because they revealed the state of appellant's mind and were relevant to prove the mental element of the crimes. The court stated the computer images were "alarming."

Defense counsel asked that the pictures be described for the jury and not admitted. The prosecutor opposed the request, saying it was necessary the jury see the pictures in order to determine their relevance. The court stated: "You can't just say they are bad pictures. If you'll remember my conversation with everybody, it's one thing to say, you know, I've got a monster in the closet. It's another thing to drag a monster out here and put him on the table and turn lights on him and see the ugliness, the warts, the green stuff dripping from its mouth and the horns and the smell. That's what this case is all about, if you guys want to know. We're going to drag out this ugly thing out of the closet, we're going to put it in the light, and all these jurors are going to be exposed to it, and the little girls are going to be exposed to it. That's what this case is about, and that's why I've been talking to you the way I have.

"You're not going to resolve it, and that's fine. So we're going to get the monster by the tail, bring it into the courtroom and put him on that table and let him puke all over the place and crap all over the place. It's going to be ugly. This is going to be ugly.

"The jury didn't manufacture this. It came out of his computer. If he's doing research, he can explain it. If he's kissing little girls, he can explain that. If he's in bed with a little girl, he can explain that. But that's the picture.

"If there [are] four little victims, four little victims are going to parade in here and say, 'The man touched me' wherever—if he was just taking his cigar and popping their balloons, we wouldn't be here. We're not talking about that. We're talking about child molestation. That's what we're talking about. And it is not pretty. It is not pretty.

"If we were talking about a NSF check case, there wouldn't be any emotion here. It would be a matter of numbers on paper, ink on paper,

dollars. But what we're talking about here is a crime against the person. Murders aren't pretty. Rapes aren't pretty. Child molests aren't pretty. And that's what we're dealing with."

The court continued by noting the strength of the prosecution's case. The court stated that no case would be manufactured against appellant and that it was necessary to guard against false accusations. The court described the computer evidence as "damning" and "overwhelming." The court stated it would admit the computer images into evidence. The court stated: "And it's relevant because those pictures get into his brain. That's a door and window and skylight into [appellant's] thinking. And the thinking is that he gets real excited with little kids, sexually aroused. That's why he's playing these games. That's why he's doing mock weddings, and that's why he's been doing this for a while. This isn't just two quick incidents. This is a whole pattern of behavior."

The court made a tentative ruling that some of the pictures would be admitted and that a limiting instruction would be given concerning their use. The court agreed that an Evidence Code section 402 hearing would be held before the evidence was admitted concerning appellant's claim that the images were downloaded after his arrest for the purposes of case preparation.

At the section 402 hearing held on August 6, 2001, appellant testified that the child pornography found on his computer was part of research he had done following his arrest. The images were downloaded from the Internet and were attached to articles or newsgroup postings dealing with the topic of pedophilia. Since appellant was essentially accused of being a pedophile, he believed it important in preparing for his defense to understand the condition.

The FBI expert who examined appellant's computer testified that he found improbable appellant's explanation that the child pornography on his computer was downloaded from the Internet or that the images were attached to articles or newsgroup postings. In the expert's opinion none of the images on the computer were accompanied by scientific text. The expert did state there was no indication any of the images was downloaded before January 1, 2001.

The trial court denied a motion to traverse the search warrant that allowed the seizure of appellant's computer. The court rejected the argument that the images were inadmissible as work product resulting from the preparation of the defense case. The court made a tentative ruling that at least some of the images from appellant's computer would be admitted at trial. The court, however, noted its concern that the pictures might prejudice or mislead the jury and left to a later time consideration of Evidence Code section 352 issues and the form of any requested limiting instruction.

On the trial date, August 8, 2001, counsel indicated appellant was prepared to enter a plea of guilty. The prosecution moved to amend the information by deleting the section 667.61 allegations, making appellant eligible for a sentence of 15 years to life, and to change counts five through ten from charges of child molestation to charges of attempted child molestation. The trial court stated: "We spent the last hour and a half . . . trying to work out a plea bargain." That conference was apparently not reported. After a proper admonishment and waiver of rights, appellant pleaded guilty to the face of the amended information. It was agreed that appellant's sentence would be between 12 and 20 years in prison and that he was giving up the right to appeal.

After taking the plea the trial court stated that the deal was a good one for the defense. The court stated it reviewed the evidence against appellant and believed it overwhelming. The court stated it was also pleased that the guilty plea would make it unnecessary that the victims testify. The court stated it would take that fact as well as appellant's clean record into consideration when sentencing him. The court stated that appellant was not an evil person.

The court noted appellant had been out of custody and had caused no problems and allowed him to remain on bail pending sentencing.

On August 29, 2001, appellant filed a motion, prepared by counsel, to withdraw his plea of guilty. Attached to the motion was a declaration from Mr. Steigerwalt and a letter to the court from appellant. In his declaration Mr. Steigerwalt stated that appellant's guilty plea came after protracted negotiations. Appellant agreed to the plea bargain on August 7, 2001. On August 13, 2001, appellant indicated to counsel that he wished to withdraw his plea of guilty. Appellant explained that at the time he agreed to change his plea, he was under tremendous stress that impaired his judgment. Appellant also stated that he entered his plea believing he could obtain certain mitigating evidence he believed would cause the judge to set a term at the lower end of the agreed range. He had now learned that evidence would not be available because of his guilty plea.

As part of his declaration Mr. Steigerwalt noted that he had discussed with appellant the possible conflicts of interest inherent in counsel pursuing appellant's request to withdraw his guilty plea. Counsel told appellant such issues involved conflicts that could effect both representation on the motion to withdraw and continuing representation in the case. Mr. Steigerwalt stated appellant was informed of his options should counsel be called as a witness concerning appellant's claim of duress.

Counsel concluded his declaration by stating that he now believed a conflict existed concerning his representation of appellant on the motion to

withdraw the plea of guilty. Counsel noted that he was a potential witness with regard to appellant's claim of duress.

In his letter to the court, appellant stated that he was innocent of the charges. He stated that at the time of his plea he faced a possible sentence of 27 years to life. Because of this possibility, his attorneys, who he believed cared for him and who believed they were acting in his best interest, urged him to plead guilty. Appellant stated he was "compelled" to accept the plea bargain because of the urging of counsel. Appellant stated part of the stress he experienced arose from the court's decision to admit the child pornography found on his computer. Appellant stated while the evidence might have some probative value, it was highly prejudicial. Appellant urged the trial court to recognize the effect the pornography had on the court. Appellant stated that after the court viewed the photographs, it declared appellant guilty of the charged crimes and he noticed a change in the court's demeanor with regard to appellant. Appellant stated the photographs would have the same effect on the jury.

Appellant also cited as a factor contributing to his stress the fact his new attorney, Mr. Steigerwalt, would have only two weeks to prepare for motions and for trial. Appellant stated that these factors and the urging of his attorney put him under "extreme duress" and led him to agree to the plea bargain.

The prosecutor opposed the motion, arguing there was no basis to allow appellant to withdraw his plea of guilty.

A hearing on the motion was held on September 6, 2001. Mr. Steigerwalt reviewed the chronology of appellant's change of plea. He noted that the night before trial appellant decided to accept the plea bargain and signed the change of plea form. The next morning appellant called counsel and stated he had changed his mind and wished to go to trial. Before the jury was called, appellant was allowed to reconsider and decided to accept the plea bargain and enter a plea of guilty.

Counsel noted that the following Monday he received another call from appellant indicating he had again changed his mind and wished to withdraw his plea. After discussing the matter at length, it was agreed appellant would think about the matter until Friday. On Friday appellant told counsel he wished to withdraw his plea. Counsel stated he first researched the issue of whether he could ethically file the motion and then filed it.

Counsel argued that at the time he entered his plea, appellant was under a "great deal of stress and/or duress." Counsel further argued that at the time appellant entered his plea, appellant believed he would receive considerable

support that could be presented at sentencing. As a result of his plea, however, that support had "evaporated."

Appellant personally addressed the court. Before he did so the court told him not to worry, and not to be uncomfortable. The court told appellant if there was a "righteous" reason to set aside the plea it would do so.

Appellant stated he had always maintained his innocence and for that reason had always stated he would not plead guilty. When the trial court noted appellant was facing a very severe sentence, appellant replied: "That was where the pressure was coming from in order to make me sign the plea agreement, the fact that it's not just a life top, but my attorney also told me that some of the counts can be sentenced consecutively and give me as much as 27 years to life."

Appellant added that he was stressed since his new attorney, Mr. Steigerwalt, would have only two weeks to prepare for trial and was not ready for trial. Appellant noted that nine days before trial the defense received discovery concerning two additional alleged victims which added more to counsel's burden in preparing for trial.

Appellant also stated his decision to plead guilty was influenced by the court's reaction to the pictures found on appellant's computer. Appellant stated: "The pictures had a major, drastic effect on you prejudicially the first day I walked into the courtroom."

The court replied that any normal person would be outraged by the images. Appellant stated that was his point. Appellant told the trial court that the major source of duress was from the trial court, its statements and apparent attitude. Appellant repeated his impression that after the computer images were shown to the court its attitude about appellant changed. Appellant stated he believed that seeing the computer evidence the court concluded appellant was guilty and called him a threat to society. Appellant did not believe the trial court intended to give him a fair trial.

The court replied that it had repeatedly told appellant not to plead guilty if he was not guilty. The court stated it was concerned that appellant would go to trial, be convicted and receive a life sentence. The court stated it concluded that had appellant gone to trial the likelihood of his being convicted was "enormous." The court stated it was also interested in not further victimizing the victims. Appellant replied he believed the court had forced him to plead guilty. After a lengthy dialogue between the trial court and appellant concerning appellant's plea of guilty, the court denied the motion to withdraw the plea.

The trial court then stated it was concerned that appellant was a flight risk because of his conclusion that he had been "railroaded" and because of the lengthy sentence he was facing. The court therefore remanded him to custody.

On October 23, 2001, appellant renewed his motion to withdraw his plea of guilty. Attached to the motion were several documents supporting appellant's claim of duress, including a lengthy letter written by appellant. In a footnote to the motion Mr. Steigerwalt noted that he was bringing the renewed motion at appellant's behest, as he was required to do. Counsel stated, however, he did not necessarily endorse all factual statements contained in appellant's letter. Mr. Steigerwalt admitted that he and cocounsel used "all their power[s] of persuasion in order to convince defendant to accept the instant plea bargain." Counsel stated in the footnote that it was and remained counsel's conclusion that accepting the plea bargain was in appellant's best interest. He stated it would have been ineffective assistance of counsel to fail to apprise appellant completely of the case against him. Mr. Steigerwalt stated: "In the end, it was defendant's choice, just as it is now to bring the within motion." Counsel ended by saying: "[I]f defendant is now claiming that counsel acted inappropriately, then Mr. Steigerwalt and Mr. Matthews must be relieved and new counsel appointed." ·

Appellant's letter chronicled the events of the case on and off the record. In his letter appellant complained that the trial court denied his new attorney, Mr. Steigerwalt, a reasonable amount of time to prepare for trial, repeatedly denied meritorious defense motions and generally appeared antagonistic to appellant. Appellant, describing the court's conduct as "abusive," concluded he would not get a fair trial before Judge Brown.

The letter in detail discussed the efforts of Mr. Steigerwalt and Mr. Matthews to "pressure" appellant into entering a plea and appellant's resistance to those efforts. In the letter appellant states that after the court ruled the images on his computer were admissible, counsel asked appellant's permission to reopen plea negotiations. Appellant did not want to plead guilty but told counsel "if it will make you feel better, go ahead." Appellant hoped the matter would be dropped and counsel "would turn his energy toward preparing for trial." Appellant describes this as a "fateful mistake."

The letter then reviews plea negotiations. Appellant states that on August 7, 2001, he signed with great reluctance a plea agreement that stipulated a 12-year sentence and gave him the right to appeal. However, when later that day he was told by his investigator of the discovery of new evidence favorable to his case, appellant decided not to plead guilty. On the morning of trial appellant informed counsel of his decision. Mr. Matthews told appellant he thought he was making a great mistake. Appellant, Mr. Matthews and

Mr. Steigerwalt went into a jury room. The lawyers went over all the reasons why they believed that if appellant went to trial he would be found guilty. Appellant states Mr. Steigerwalt used "prosecutor tactics" in order to persuade him to accept the plea bargain. Appellant noted that at one point in order to embarrass him, Mr. Steigerwalt began kissing the table to simulate the Sleeping Beauty game appellant allegedly played with Alyssa.

Appellant stated he had had little or no sleep, was under extreme stress and that his judgment was impaired. He felt he was on the verge of a nervous breakdown, cried from time to time and was getting no support from his attorneys. Appellant stated he was incapable of dealing with the "bombardment of issues" coming from counsel. Eventually, appellant "surrendered" and asked counsel what he had to do.

Appellant states in his letter that the plea agreement was changed, the sentence range was increased and he was required to give up his appeal rights. Appellant states he did not have the energy to resist. He states he only signed the agreement because of extreme duress under which he was operating. Appellant states "nobody bothered to look out for my interests while I was in this diminished mental state."

Appellant states that the next day, he came to his senses and told counsel he wished to withdraw his plea.

At a hearing on the renewed motion Mr. Steigerwalt said appellant's letter fully set out appellant's concerns. Counsel stated he did not necessarily agree with everything in the letter but it nonetheless clearly stated appellant's position and view of the facts. Mr. Steigerwalt noted that while he was officially hired a couple of weeks before the trial date, he had been involved in the case for months. Mr. Steigerwalt stated that it was still his opinion that accepting the plea bargain was in appellant's best interest.

The court asked if appellant believed he had received poor legal advice or faulted his legal representation or had been pressured by counsel. Appellant stated to the court that he was "not challenging the advice [of counsel]" and that he did not find fault with his representation.

The trial court stated that his was a trial and not a settlement department. He then noted, however: "It's appropriate for judges and I think it's a good policy to stop prior to selecting a jury, because usually what happens as they are walking down the hall, if not long before then, the parties on both sides are polarized. So it's been my habit and custom when there is a possibility of resolving this case at the 11th hour, to discuss with the district attorney and the defense the facts of life.

"And the facts of life are that the evidence in this case was overwhelming. The evidence in this case was overwhelming." The court stated that the images found on appellant's computer were admissible and would have established beyond question appellant's intent in touching the victims. The court stated it was true that in a criminal trial anything was possible and appellant might have been acquitted. The court stated there was a downside to going to trial: "The down side for the people is they have to bring these little girls in, and they have to relive all this. And that further traumatizes them."

The court noted that it explained to appellant the evidence against him. It explained that if the matter was not resolved by a bargain and he was convicted, then appellant was going to spend the rest of his life in prison. The court stated he was a trial and not disposition judge and he did not get points for settling cases. The court stated: "But I'm a realist, and I care about the administration of justice. I care very much about people's liberty. I care about doing the right thing.

"And, quite frankly, for a fleeting moment I thought: Oh, you want a trial? You'll get a trial. But that passed through my mind because, you know, it's sort of a mean thing to say. You want a trial? You want a trial? Do you want to spend the rest of your life in prison? That was a fleeting thought I couldn't help."

After discussing the process of taking appellant's plea and the fact that nothing had changed since that time, the court denied the renewed motion to withdraw the plea.

### B. *Law*

### 1. *Plea Withdrawal*

■ A defendant who seeks to withdraw his guilty plea may do so before judgment has been entered upon a showing of good cause. (*In re Vargas* (2000) 83 Cal.App.4th 1125, 1142 [100 Cal.Rptr.2d 265]; *People v. Castaneda* (1995) 37 Cal.App.4th 1612, 1616–1617 [44 Cal.Rptr.2d 666].) "Section 1018 provides that . . . 'On application of the defendant at any time before judgment . . . the court may, . . . for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted.' Good cause must be shown for such a withdrawal, based on clear and convincing evidence. [Citation.]" (*People v. Mickens* (1995) 38 Cal.App.4th 1557, 1561 [45 Cal.Rptr.2d 633]; see also *People v. Hunt* (1985) 174 Cal.App.3d 95, 102–103 [219 Cal.Rptr. 731].) "To establish good cause, it must be shown that defendant was operating under mistake, ignorance, or any other factor

overcoming the exercise of his free judgment. [Citations.] Other factors overcoming defendant's free judgment include inadvertence, fraud or duress. [Citations.]" (*People v. Huricks* (1995) 32 Cal.App.4th 1201, 1208 [38 Cal.Rptr.2d 592].) "The burden is on the defendant to present clear and convincing evidence the ends of justice would be subserved by permitting a change of plea to not guilty." (*People v. Shaw* (1998) 64 Cal.App.4th 492, 496 [74 Cal.Rptr.2d 915].)

"When a defendant is represented by counsel, the grant or denial of an application to withdraw a plea is purely within the discretion of the trial court after consideration of all factors necessary to bring about a just result. [Citations.] On appeal, the trial court's decision will be upheld unless there is a clear showing of abuse of discretion. [Citations.]" (*People v. Shaw, supra,* 64 Cal.App.4th at pp. 495–496.) "Guilty pleas resulting from a bargain should not be set aside lightly and finality of proceedings should be encouraged." (*People v. Hunt, supra,* 174 Cal.App.3d at p. 103.)

### 2. Judicial Involvement in Plea Negotiations

Appellant contends his plea of guilty was entered under duress. While he attributes some of the pressure to counsel, he argues, as he did below, that the most significant pressure came from the trial court.

We know little about counsel's discussions with appellant concerning the entry of his plea. Those discussions were lengthy and occurred off the record. In any case, attempting to define some line between a defense attorney's aggressive but proper advice to plead guilty and oppressive conduct leading to an involuntary plea would be a difficult and sensitive task.

We know far more about the trial court's behavior. Most, but not all, of the court's contact with appellant is of record. Case law and other authoritative sources have discussed the important issue of trial court involvement in plea negotiations. While those sources differ about the details of judicial involvement most express strong misgivings about it and the effect it can have not only on the voluntariness of pleas but also on the appearance of fairness.

Federal Rules of Criminal Procedure, rule 11(c) (18 U.S.C.), states that an attorney for the government and the defense may discuss and reach a plea agreement. The rule adds, however: "The court must not participate in these discussions. "

Courts have stated there are at least three reasons for the rule. First, it diminishes the possibility of judicial coercion of guilty pleas regardless of whether the coercion actually results in an involuntary plea. Second, such

involvement may impair the court's impartiality since a judge who suggests or encourages a plea bargain may feel a personal stake in an agreement and may resent a defendant who rejects the court's advice. Third, judicial participation in plea discussions creates a misleading impression of the judge's role. A judge participating in plea negotiations can often appear not to be a neutral arbiter but rather an advocate for the resolution that the court has suggested. (*United States v. Miles* (5th Cir. 1993) 10 F.3d 1135, 1139; *United States v. Bruce* (9th Cir. 1992) 976 F.2d 552, 556; see generally Prohibition of Federal Judge's Participation in Plea Bargaining Negotiations Under Rule 11(e) of Federal Rules of Criminal Procedure (2000) 161 A.L.R. Fed. 537.)

Section 14-3.3(c) of the American Bar Association Standards for Criminal Justice, Pleas of Guilty (3d ed. 1999) states: "The judge should not through word or demeanor, either directly or indirectly, communicate to the defendant or defense counsel that a plea agreement should be accepted or that a guilty plea should be entered."

Section 14-3.3(d) of the American Bar Association Standards for Criminal Justice, *supra*, states: "A judge should not ordinarily participate in plea negotiation discussions among the parties. Upon request of the parties, a judge may be presented with a proposed plea agreement negotiated by the parties and may indicate whether the court would accept the terms as proposed."

The commentary to subdivisions (c) and (d) of the American Bar Association Standards for Criminal Justice, *supra*, section 14-3.3 states: "This standard is important because it protects the constitutional presumption of innocence, and avoids placing judicial pressure on the defendant to compromise his or her rights." The commentary continues: "The approach taken by these standards differs from that in the second edition, which had allowed for a more active role for judges in plea negotiations. It returns to the approach taken in the first edition, which is more consistent with federal law and the rules in many states. A number of court decisions have condemned judicial participation in plea negotiations. Similarly, Federal Rules of Criminal Procedure and numerous statutes and rules forbid the involvement of judges in plea discussions. While there is some evidence that judicial participation in plea negotiations is common in some courts, this is not a salutary development." (*Id.*, at pp. 134–135, fns. omitted.)

The commentary also states: "Providing an active role for judges in the plea negotiation process, even at the parties' request, is ill-advised, particularly where that judge will preside at trial or at evidentiary hearings should the plea negotiations fail. Such a role is fundamentally in tension with the basic principle that the court 'should never through word or demeanor, either directly or indirectly, communicate to the defendant or defense counsel that a

plea agreement should be accepted or that a guilty plea should be entered.' Exposure to the facts and tactical considerations revealed during guilty plea negotiations may unduly color the judge's view of the evidence, and predispose the judge in his or her legal rulings." (ABA Stds. for Criminal Justice, *supra*, at p. 135, fn. omitted.)

In the states there is a spectrum of opinion concerning the involvement of judges in plea negotiations. Some follow the federal rule and prohibit any involvement. In some of those jurisdictions judicial involvement in plea negotiations is considered so serious that reversal is required even without a finding that the plea was involuntary. Other states, while expressing concern with judicial involvement in plea negotiations, treat the matter on a case-by-case basis. Since the matter is case-specific there is no general rule describing when court involvement has resulted in a coerced plea. Important factors, however, include whether the court was the moving force in pressing for a guilty plea after the defendant indicated a desire to go to trial and when the court during negotiations indicated conviction was a foregone conclusion. (5 LaFave, Criminal Procedure (2d ed. 1999) § 21.2 (c), (d); Voluntariness of Plea—Judge's Influence (1981) 10 A.L.R. 4th 689.)

There is no rule in California forbidding judicial involvement in plea negotiations. Nonetheless courts have expressed strong reservation about the practice. In *People v. Williams* (1969) 269 Cal.App.2d 879, 884 [75 Cal.Rptr. 348], the court stated that "special problems are presented when the *judge* participates in plea negotiations. Experience suggests that such judicial activity risks more, in terms of unintentional coercion of defendants, than it gains in promoting understanding and voluntary pleas, and thus most authorities recommend that it be kept to a minimum [citations]." (See also *People v. Orin* (1975) 13 Cal.3d 937, 943 [120 Cal.Rptr. 65, 533 P.2d 193]; *People v. Jensen* (1992) 4 Cal.App.4th 978, 983–984 [6 Cal.Rptr.2d 201].)

The California Judges Benchbook makes this observation: "The degree and manner of a judge's participation in plea negotiation, i.e., his or her role, varies among judges. Many judges prefer to stay out of the actual negotiating process and be brought into the matter once a bargain has been attained. Success depends entirely on the approach taken by the prosecution and defense representatives. Some judges feel that they should actively participate in the negotiations as a mediator, as one seeking to bring conflicting or antagonistic views together on a reasonable solution. Here a cautious approach may achieve more. The judge should maintain total neutrality and at the same time probe continually for a common meeting ground. Patience, tact, and persistence pay off in an increased number of dispositions.

"One district attorney in a large county has suggested that there is a great advantage to the court's active participation, but cautions that, because of the

court's power and dignity, the defendant and counsel for both sides must not be made to feel that the judge will feel unkindly toward them if negotiations fall through." (*California Judges Benchbook, Criminal Pretrial Proceedings* (CJER 1991) § 2.11, pp. 87–88.)

### C. *Analysis*

No one, not even appellant, doubts that it was the trial judge's intention to encourage a plea bargain that was in everyone's best interest. The judge, however, went too far. The judicial change of "hats" in this case is head spinning. At any given time he seemed to fill the role of judge, jury, defense counsel, prosecutor, psychiatrist, social worker and victims' advocate. While in some objective sense it may be that the judge, a person of long experience, did know what was best for everyone, that is beside the point.

The judge not only concluded and expressed that appellant, save for some irrationality on the part of the jury, would be convicted, he also concluded the crimes were the result of a particular and dangerous mental disorder. The judge's histrionic monologues were not the stuff of mediation or facilitation. They were the stuff of advocacy. His understandable and often expressed concern that the victims not be victimized again could reasonably be taken by appellant and others viewing the proceeding as a comment that the judge would not look favorably on those who would, to no end, harm the children the defendant already harmed. The level and manner of the judge's interest and involvement in the negotiation process, particularly that of record and in appellant's presence, colored every aspect of the proceeding.

There is no doubt the trial judge meant to do justice. Certainly it was the judge's intention to assist everyone by expressing in the clearest terms his assessment of the case. But, as the cases and commentators cited above have repeatedly noted, there are great risks in the trial court involving itself in the plea negotiation process. As that involvement increases in intensity, the risks become greater.

In asking that he be allowed to withdraw his guilty plea, appellant stated that a major source of pressure that led to that plea came from the trial court's comments and its apparent attitude towards him. Appellant described the court's conduct as abusive and antagonistic. Appellant concluded the judge believed he was guilty and dangerous and that he would not get a fair trial.

With all due respect to the trial judge, we understand why appellant reached these conclusions. The trial court's conduct was highly inappropriate. Appellant established good cause for the withdrawal of his plea. Certainly not every instance of judicial involvement in plea negotiations results

in duress. While some jurisdictions totally foreclose judicial participation in plea bargaining, California does not. Judges can, in appropriate cases and in a reserved manner, play a useful part in that process. However, when the trial court abandons its judicial role and thrusts itself to the center of the negotiation process and makes repeated comments that suggest a less-than-neutral attitude about the case or the defendant, then great pressure exists for the defendant to accede to the court's wishes. We conclude that is what occurred here. The actions of the trial court in the context of this case overcame appellant's free judgment. The trial court therefore abused its discretion in denying appellant's motion to withdraw his plea.

The judgment is reversed. The matter is remanded to the trial court for a hearing not to be held by Judge Brown, at which appellant will be allowed to withdraw his plea of guilty.[2]

McDonald, J., and O'Rourke, J., concurred.

On May 5, 2004, the opinion was modified to read as printed above.

---

[2] We do not address appellant's claim that count five of the amended information was time-barred.