[No. D045846. Fourth Dist., Div. One. June 7, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN SANDOVAL, Jr., Defendant and Appellant.

COUNSEL

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary Schons, Assistant Attorney General, Lilia E. Garcia and Janelle Marie Boustany, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

AARON, J.—

I.

INTRODUCTION

Steven Sandoval, Jr., pled guilty to one count of voluntary manslaughter (Pen. Code,[1] § 192, subd. (a)), and admitted having incurred a prior serious

---

[1] Unless otherwise specified, all subsequent statutory references are to the Penal Code.

felony conviction (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)) and a prior strike conviction (§§ 667, subds. (b)–(i), 1192.7, subd. (c)(23)), pursuant to a plea agreement that provided for a stipulated sentence of 27 years in state prison. Before he was sentenced, Sandoval filed a motion to withdraw his guilty plea on the ground that his plea had not been a product of his own free will. Sandoval claimed that one of his codefendants had threatened to harm him in prison if he refused to plead guilty, and that the trial judge had improperly pressured him to plead guilty. The trial court denied Sandoval's motion to withdraw his guilty plea and sentenced him to 27 years in prison.

On appeal, Sandoval claims that the trial court erred in denying his motion to withdraw his guilty plea. Sandoval also contends that the trial court erred in sentencing him pursuant to the "Three Strikes" law because the People did not allege in an information that he had suffered a prior strike conviction.

We conclude that the trial court abused its discretion in denying Sandoval's motion to withdraw his guilty plea. We also conclude that the People adequately amended the information to allege that Sandoval had suffered a prior strike conviction. We reverse the judgment and remand the case to the trial court with directions to allow Sandoval to withdraw his guilty plea.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The charged crime[2]*

On September 22, 2003, Michael Owens was stabbed to death in a park in Chula Vista. Sandoval was later identified in a live lineup as one of several gang members who had confronted Owens and his friends just prior to the stabbing.

B. *Procedural background*

On September 15, 2004, the People filed a five-count information charging Sandoval and three codefendants, Eric Damian Esparza, Jeffrey Daniel Mesa, and Jesse Pantoja[3] with murder (§ 187, subd. (a)) (count 1), robbery (§ 211) (count 2), participating in a criminal street gang (§ 186.22, subd. (a)) (count 3),

---

[2] During the hearing at which Sandoval pled guilty, Sandoval's counsel agreed that the preliminary hearing transcript would serve as the factual basis for his plea. Because the facts of the underlying crime are not relevant to the issues on appeal, we adopt the abbreviated version of the facts of the underlying crime as set forth in the People's brief, which they in turn drew from Sandoval's brief.

[3] Codefendants Esparza, Mesa, and Pantoja are not parties to this appeal.

and two counts of battery committed for the benefit of a criminal street gang (§§ 242, 186.22, subd. (d)) (counts 4 and 5).

On September 28, all four defendants pled guilty. Sandoval pled guilty to one count of voluntary manslaughter (§ 192, subd. (a)) and admitted having incurred a prior serious felony conviction (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)) and a prior strike conviction (§§ 667, subds. (b)–(i), 1192.7, subd. (c)(23)), pursuant to a plea agreement that provided for a stipulated sentence of 27 years in state prison.

Prior to sentencing, Sandoval filed a motion to withdraw his guilty plea. The trial court held a hearing on Sandoval's motion to withdraw his guilty plea. At the conclusion of the hearing, the court denied Sandoval's motion and sentenced him to 27 years in prison.

Sandoval timely filed a notice of appeal and a request for a certificate of probable cause to appeal. The trial court issued a certificate of probable cause to appeal.

### III.

### DISCUSSION

A. *The trial court abused its discretion in refusing to allow Sandoval to withdraw his guilty plea*

Sandoval claims the trial court erred in refusing to allow him to withdraw his guilty plea.

1. *Factual and procedural background*

 a. *Sandoval's initial refusal to enter into a "package-deal" plea agreement*

A jury trial was scheduled to commence in this case on September 15, 2004. Between September 15 and September 28, the trial court heard various pretrial motions, conducted an evidentiary hearing, had exhibits marked for trial, and began to conduct voir dire of potential jurors.

On the morning of September 28, the trial court indicated on the record that the People wanted to conduct an *Alvernaz* waiver[4] for each defendant.

---

[4] A defendant provides an *Alvernaz* waiver by stating on the record that he is unwilling, or unable, to enter into the terms of a plea bargain agreement. (See *In re Alvernaz* (1992) 2 Cal.4th

The prosecutor stated that if defendants Pantoja and Esparza were found guilty as charged, the maximum term of imprisonment for each of them would be 71 years to life, and noted that the current plea offer as to each of these defendants was 16 years in prison. The prosecutor stated that Sandoval and Mesa were each facing a maximum term of imprisonment of 110 years to life, and that each had been offered 27 years in prison. The prosecutor explained that the current offers were a "package deal," meaning that the People would agree to enter into the plea agreement only if all four defendants agreed to accept the offers.

The trial court inquired of each defendant's attorney whether his or her client was amenable to entering into the plea agreement. The attorneys for Pantoja, Esparza and Mesa stated that their respective clients wanted to enter into the plea agreement. Sandoval's attorney, Liesbeth Vandenbosch, indicated that Sandoval did not want to plead guilty. The attorneys for Pantoja, Esparza, and Mesa said that because the offers were part of a package deal and Sandoval did not want to accept the offer, their clients could not accept the plea offers that had been made to them.

Esparza's attorney, Paul Neuharth, requested that the trial court inquire of each of the defendants, personally, whether he wished to accept the plea bargain. The court agreed to do so. Pantoja, Esparza, and Mesa all said that they wanted to accept the plea bargain. When the court asked Sandoval whether he wished to accept the offer, Sandoval stated, "I wish not to take that deal." In response, the trial judge stated: "Okay. We'll go to trial. [¶] The record should be clear this is an offer that I think on the face of it is real clear that it is a very good offer. [¶] So, we go to trial. [¶] Okay. Thank you, very much. Anything else we can do? I can't twist Mr. Sandoval's arm. I don't think anybody should or could."

Mesa's attorney, Bernard Skomal, commented, "The only problem is [Sandoval is] drawing three other people in who do want to take the deal . . . . So that the record is clear, that when a person dies, there's a homicide case, the offer, when the determinate sentence is in the 20's, it is not a good deal, it is a very, very good deal." The trial judge responded, "Oh, yes. But the catch is, I mean, assuming for the moment—I'm going to assume, based on the transcript, this is gang activity. They're choosing to stick together in the sense of that's the culture." The judge continued, stating that although each of the defendants could go to the prosecutor and indicate his willingness to testify, the defendants were apparently not willing to do so because of their gang

924, 928 [8 Cal.Rptr.2d 713, 830 P.2d 747] [holding "when a defendant demonstrates that ineffective representation at the pretrial stage of a criminal proceeding caused him or her to proceed to trial rather than to accept an offer of a plea bargain that would have been approved by the court, the defendant has been deprived of the effective assistance of counsel"].)

culture. The judge stated, "They're going to stick together; they're going to stand behind him. That's the way it is. [¶] That's okay. And Mr. Sandoval wants a trial, we'll give him his trial. [¶] I mean I have sympathy for the others, but that's . . . ."

Pantoja's attorney, Thomas Ochs, interrupted the court to request that the court explore whether the prosecutor would consider "breaking up the package deal," if the defendants were willing to testify at trial. The judge responded, "Maybe the D.A. will consider that. [¶] I mean, going to trial on one is a lot shorter than going to trial on four." The prosecutor expressed a willingness to explore this possibility in separate chambers conferences with each defendant's attorney and the court.

### b. The chambers conferences

The trial judge held four consecutive chambers conferences with the attorneys for each defendant and the prosecutor. At the conferences, the participants discussed whether there was anything that could be done either to encourage Sandoval to accept the plea offer or to persuade the prosecutor to allow the other defendants to plead guilty in exchange for their testimony. During the conference with Attorney Ochs, the trial judge asked the prosecutor, "If all three of the other defendants decided they're willing to testify, does that change things, or are we going down a road that's not really realistic?" At the conference with Attorney Skomal, the judge stated, "I don't know if there is anything I can say that is appropriate other than what I did say. I admit I was sort of tiptoeing through saying how wonderful the offer was." During the conference with Attorney Neuharth, Esparza's attorney, the judge stated, "[I]s there anything you can see that I could do?" The judge agreed with Attorney Neuharth's observation that "the court is in a difficult position of trying to make any defendant enter a plea."

At the chambers conferences, the judge attempted to gain an understanding of why Sandoval was refusing to accept the offer. The judge discussed with the prosecutor and Attorney Skomal, Mesa's attorney, whether or not Sandoval's defense counsel had advised him to accept the offer. The judge also expressed her belief that Sandoval was being selfish in insisting on going to trial. When Attorney Skomal stated that his client had attempted to encourage Sandoval to accept the plea offer, the judge stated, "So much for looking out for your fellow gang members."

The trial judge also expressed her view that the People probably believed that Sandoval was the actual killer. In addition, the judge stated that she was willing to tell the defendants that "there is more than ample evidence to support a conviction" as to all of them. Apparently recognizing that such a statement might be coercive, the trial judge added, "I think I can say that."

During the conference with Attorney Vandenbosch, Sandoval's attorney, the trial judge stated, "It sound[s] like the issue is your client." The judge commented that she realized Sandoval was "firm" in insisting on a trial. Attorney Vandenbosch informed the court that she had "encouraged [her] client that this is an offer he should accept." However, Attorney Vandenbosch believed it was very unlikely that Sandoval would agree to accept the plea bargain, observing: "If anybody could have caused [Sandoval] to reflect more, it would have been the three codefendants, and it apparently is not happening. So he seems quite adamant about his position. So, I'm not hopeful . . . ."

Throughout the chambers conferences, the trial judge repeatedly expressed her belief that the package deal was "an amazing offer." The judge said that she was probably going to set a deadline of 5:00 p.m. the following day for the defendants to accept the offers, stating that her reason for imposing a deadline was that she was uncomfortable with the deal since it was so favorable to the defendants.

Near the end of the conferences, the trial judge stated, "So, I'm just not sure there's a whole lot we can do." However, in a final attempt to explore a possible tactic for resolving the case, the judge asked Attorney Vandenbosch whether it "would be of assistance" in persuading Sandoval to plead guilty if the trial court were to explain the felony-murder rule to him. Vandenbosch responded in the negative. At this point, the court concluded the conferences.

### c. *The court proceedings immediately prior to Sandoval's indication that he would plead guilty*

After concluding the chambers conferences, the court went on the record with all defendants present. The judge stated that she was setting a deadline of 5:00 p.m. the following day for the defendants to accept the "amazingly good offer" because she was "not particularly comfortable with it." The judge continued, observing that the "offer is exceptionally good," and "really low," in light of the evidence. The judge added that after the deadline, "I don't have to go along with [the offer]." The judge also commented, "[T]here's more than sufficient evidence for a jury to convict each and every one of the defendants."

The trial judge proceeded to explain the felony-murder rule to the defendants and told them that culpability for felony murder was an "available argument for the People." The judge then stated, "Each of the codefendants has the ability to make a decision whether they want to testify or not, both in their trial, [*sic*] or to plead and then testify if that were an option."

The judge clearly indicated that she sympathized with the three defendants who were willing to plead guilty but were prevented from doing so because

of Sandoval's refusal to accept the offer. The court commented to the defendants that it was "sort of a sad situation that you're looking at spending your entire life in state prison," and expressed her view that Sandoval was letting down his fellow gang members by refusing to accept a sentence of 27 years in prison and insisting upon his right to a trial: "I think maybe the three who were willing to plead are learning that maybe the gang isn't all it was cracked up to be, if someone's willing to take you down with them and you stand behind them. [¶] So despite all the voir dire about gangs having good things, they have their down sides, and 70 years in state prison, I feel for you if you're going to be spending your whole life in state prison. [¶] That's a decision that each of you have made during the course of your life. [¶] As I've said, there's nothing I can do."

Attorney Neuharth requested that the court take a five-minute recess to allow the defense attorneys time to talk with their clients, in light of the court's comments. The court stated that it would like to continue with the voir dire because the jurors were waiting, but agreed to take a five-minute recess.

### d. *Sandoval's guilty plea*

Immediately following the recess, Attorney Skomal indicated to the trial court that all four defendants were willing to accept the plea offers. He inquired whether the court wished to continue with the voir dire at that time, or instead, take the defendants' pleas. The trial court stated that it would prefer to continue with the voir dire and take the pleas that afternoon because the court did not want to let the jury go if there were a possibility that the defendants would not actually plead guilty. Attorney Skomal then suggested that the court "get an indication" on the record of Sandoval's intention to accept the plea offer. Attorney Vandenbosch stated that Sandoval had told her he wanted to accept the plea offer.

After the noon recess, each of the defendants pled guilty. Sandoval pled guilty to voluntary manslaughter and admitted having incurred a serious felony prior and a strike prior. In exchange for Sandoval's plea, the prosecution stipulated to a sentence of 27 years in state prison.

During Sandoval's plea colloquy, the court asked him whether anyone had threatened him or any members of his family in order to get him to plead guilty. Sandoval responded in the negative. The court then asked Sandoval, "Do you feel pressured [or] that you've been pressured into pleading guilty, [that] this is isn't voluntary?" Sandoval responded, "No." The court stated, "Okay. Are you pleading guilty freely and voluntarily at this point?" Sandoval responded that he was.

e. *Sandoval's motion to withdraw his guilty plea*

On October 27, Sandoval appeared in court and informed the court that he wished to withdraw his guilty plea. The court appointed Attorney Joseph Cox to represent Sandoval in connection with his motion to withdraw his plea.

On December 17, prior to sentencing, Sandoval filed a motion to withdraw his guilty plea on the ground that his plea had not been a product of his own free will. In support of his motion, Sandoval claimed that during the recess immediately before he indicated his willingness to accept the plea offer, codefendant Mesa had threatened to harm him in prison if he continued to refuse to accept the offer. Sandoval also claimed that the effect of the trial judge's comments that day was to pressure him into agreeing to accept the plea offer. Sandoval requested that the trial judge recuse herself from ruling on his motion to withdraw his plea, in light of his claim that the judge had improperly pressured him to plead guilty.

In their opposition to the motion, the People claimed that Sandoval had a "case of buyer's remorse." The People maintained that the court had not improperly pressured Sandoval to plead guilty and that Sandoval's claim that Mesa had threatened him was not credible.

The trial court held an evidentiary hearing on Sandoval's motion to withdraw his guilty plea. At the beginning of the hearing, Attorney Cox asked whether the trial judge intended to recuse herself from ruling on the motion to withdraw the plea. The judge stated that she was "comfortable about being objective," and denied the recusal request.

Codefendant Mesa, Attorney Skomal and Attorney Vandenbosch all testified at the hearing. Mesa testified that during the brief recess immediately before Sandoval agreed to plead guilty, the court granted Mesa's request to have the bailiff seat him next to Sandoval so that the two could have a conversation. Mesa said that during this conversation, Mesa told Sandoval that he, Mesa, was "not going to do life" and that he threatened Sandoval, saying "if you don't sign this deal, I'm going to get [your] ass in prison." Mesa then told Sandoval, "Please don't make me do something that I don't want to do." Mesa testified that Sandoval responded that he would plead guilty "out of benefit for [Mesa]." When Attorney Cox asked Mesa whether he had threatened Sandoval's life during that conversation, Mesa responded, "Basically yes."

Attorney Skomal testified that immediately after he learned that Sandoval had agreed to plead guilty, he asked Mesa why Sandoval had changed his mind. Mesa told Skomal that he had threatened to "get [Sandoval's] ass."

Attorney Skomal testified that just prior to the lunch recess on the day Sandoval pled guilty, Skomal "spoke briefly to [Attorney Vandenbosch] about checking into [Sandoval's] plea." Skomal testified that he believed he mentioned "threats, violence, something of that nature," to Attorney Vandenbosch, but that he had not gotten into specifics. Skomal testified that he took this "limited action" rather than revealing the substance of his entire conversation with Mesa because Skomal believed the statements Mesa made to him were protected by the attorney-client privilege.

Attorney Vandenbosch testified that Sandoval had steadfastly insisted on proceeding to trial the entire time she represented him, from October 2003 until the morning he agreed to accept the plea offer on September 28, 2004. Although she could not recall the specific timeframe, Attorney Vandenbosch testified that Attorney Skomal had expressed to her his concern that Mesa might be putting "significant pressure on Mr. Sandoval to resolve the case." Attorney Vandenbosch said on the day Sandoval pled guilty, she asked Sandoval several times before he entered his plea if he was sure he wanted to plead guilty, and that Sandoval indicated he did.

However, the day after Sandoval entered his guilty plea, he telephoned Attorney Vandenbosch and said he wanted to withdraw his plea. He told her that he had felt pressured to plead guilty. Vandenbosch told Sandoval to think about it, and to call her a week before his next scheduled court appearance, which would be in approximately four weeks. Sandoval telephoned Vandenbosch as instructed. During this conversation, Sandoval stated unequivocally that he wanted to withdraw his guilty plea and that he had been threatened by Mesa on the day he entered his plea. Vandenbosch also testified that prior to Sandoval entering his guilty plea, there had been discussions among the defense attorneys, in Sandoval's presence, concerning the fact that Mesa had been accused of organizing an attack on another inmate.

### f. *The trial court's ruling denying Sandoval's motion to withdraw his guilty plea*

At the conclusion of the hearing on Sandoval's motion to withdraw his plea, the trial court denied the motion. The court stated that the court's taking *Alvernaz* waivers, commenting that the offer was a good offer, and setting a deadline for the defendants to accept the plea offer, were not intended to pressure Sandoval into pleading guilty. The court stated that it had offered Sandoval the opportunity to say that he was feeling pressured during the plea colloquy, and noted that he had not done so. The court also commented that it believed Sandoval decided to change his plea because he recognized that the trial was actually going forward, that he did not want to spend his life in prison, and "he was participating with what was in the best interests of his gang members."

With regard to the conversation between Mesa and Sandoval during the recess immediately prior to Sandoval changing his mind and agreeing to plead guilty, the court stated that it had "absolute confidence in the testimony of Mr. Skomal and Ms. Vandenbosch." More specifically, the court said it believed Mesa had in fact told Skomal that he had threatened Sandoval. As to whether Mesa had actually threatened Sandoval, the court stated: "Do I think maybe a comment was made along those lines? You know, I'm sure there was. I'm sure there were conversations that went on, but nothing that in any way caused [Sandoval] to really feel threatened."

2. *Governing law*

 a. *General principles applicable to a motion to withdraw a guilty plea*

In *People v. Weaver* (2004) 118 Cal.App.4th 131, 145–146 [12 Cal.Rptr.3d 742] (*Weaver*), this court outlined the general legal principles applicable to consideration of a defendant's motion to withdraw a guilty plea.

■ "A defendant who seeks to withdraw his guilty plea may do so before judgment has been entered upon a showing of good cause. [Citations.] 'Section 1018 provides that . . . "On application of the defendant at any time before judgment . . . the court may, . . . for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted." Good cause must be shown for such a withdrawal, based on clear and convincing evidence. [Citation.]' [Citations.] 'To establish good cause, it must be shown that defendant was operating under mistake, ignorance, or any other factor overcoming the exercise of his free judgment. [Citations.] Other factors overcoming defendant's free judgment include inadvertence, fraud or duress. [Citations.]' [Citation.] 'The burden is on the defendant to present clear and convincing evidence the ends of justice would be subserved by permitting a change of plea to not guilty.' [Citation.]

" 'When a defendant is represented by counsel, the grant or denial of an application to withdraw a plea is purely within the discretion of the trial court after consideration of all factors necessary to bring about a just result. [Citations.] On appeal, the trial court's decision will be upheld unless there is a clear showing of abuse of discretion. [Citations.]' [Citation.] 'Guilty pleas resulting from a bargain should not be set aside lightly and finality of proceedings should be encouraged.' [Citation.]"

 b. *Judicial involvement in plea negotiations*

■ The *Weaver* court provided a detailed discussion of the problems inherent in judicial involvement in plea negotiations. The court noted that the

Federal Rules of Criminal Procedure forbid any judicial involvement in plea discussions (*Weaver, supra,* 118 Cal.App.4th at p. 146, citing Fed. Rules Crim. Proc., rule 11(c), 18 U.S.C.), and that the American Bar Association Standards for Criminal Justice provide that a judge should not "ordinarily" participate in plea negotiations. (*Weaver, supra,* 118 Cal.App.4th at p. 147, citing ABA Stds. for Crim. Justice, Pleas of Guilty (3d ed. 1999) (*ABA Standards*).) The commentary to the *ABA Standards* indicates that court decisions in a number of states have "condemned judicial participation in plea negotiations." (*Weaver, supra,* 118 Cal.App.4th at p. 147, quoting *ABA Standards,* com. to rule 14-3.3, pp. 134–135.) The commentary to the *ABA Standards* also provides that it is a " 'basic principle that the court "should never through word or demeanor, either directly or indirectly, communicate to the defendant or defense counsel that a plea agreement should be accepted or that a guilty plea should be entered." ' " (*Weaver, supra,* 118 Cal.App.4th at pp. 147–148, quoting *ABA Standards,* com. to rule 14-3.3, p. 135.) The *Weaver* court commented that the basis for precluding judicial involvement in plea negotiations is to "diminish[] the possibility of judicial coercion of guilty pleas . . . ." (*Weaver, supra,* 118 Cal.App.4th at p. 146.)

The *Weaver* court also noted that although California law does not preclude judicial involvement in plea negotiations, "courts have expressed strong reservation[s] about the practice." (*Weaver, supra,* 118 Cal.App.4th at p. 148.) "In *People v. Williams* (1969) 269 Cal.App.2d 879, 884 [75 Cal.Rptr. 348], the court stated that 'special problems are presented when the *judge* participates in plea negotiations. Experience suggests that such judicial activity risks more, in terms of unintentional coercion of defendants, than it gains in promoting understanding and voluntary pleas, and thus most authorities recommend that it be kept to a minimum [citations].' (See also *People v. Orin* (1975) 13 Cal.3d 937, 943 [120 Cal.Rptr. 65, 533 P.2d 193]; *People v. Jensen* (1992) 4 Cal.App.4th 978, 983–984 [6 Cal.Rptr.2d 201].)" (*Weaver, supra,* 118 Cal.App.4th at p. 148.) The *Weaver* court noted that the California Judges Benchbook states that, to the extent a judge decides to become involved in plea negotiations, "[t]he judge should maintain total neutrality and at the same time probe continually for a common meeting ground." (*Weaver, supra,* 118 Cal.App.4th at p. 148.)

c. *The coercive nature of "package-deal" plea bargains*

■ "It has long been established that guilty pleas obtained through 'coercion, terror, inducements, subtle or blatant threats' are involuntary and violative of due process. [Citation.]" (*In re Ibarra* (1983) 34 Cal.3d 277, 287 [193 Cal.Rptr. 538, 666 P.2d 980] (*Ibarra*), disapproved on another ground in *People v. Howard* (1992) 1 Cal.4th 1132, 1175–1178 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) Such coercion is a particular danger in the package-deal plea

bargain context. In *Ibarra*, the California Supreme Court discussed the coercive nature of "package-deal" plea bargains: " 'Package-deal' plea bargains . . . may approach the line of unreasonableness. Extraneous factors not related to the case or the prosecutor's business may be brought into play. For example, a defendant may fear that his wife will be prosecuted and convicted if he does not plead guilty; or, a defendant may fear, as alleged in this case, that his codefendant will attack him if he does not plead guilty. Because such considerations do not bear any direct relation to whether the defendant himself is guilty, special scrutiny must be employed to ensure a voluntary plea. '[P]lea bargaining of adverse or lenient treatment for some person *other* than the accused . . . might pose a greater danger of inducing a false guilty plea . . . .' [Citation.]" (*Ibarra, supra,* 34 Cal.3d at p. 287.)

The *Ibarra* court noted that in many jurisdictions, courts are required to exercise "special care" in determining the voluntariness of a plea undertaken pursuant to a package-deal plea bargain. (*Ibarra, supra,* 34 Cal.3d at p. 288.) The *Ibarra* court held, "We go one step further, however, by *requiring* an inquiry into the totality of the circumstances whenever a plea is taken pursuant to a 'package-deal' bargain." (*Ibid.*) The *Ibarra* court mandated that a trial court consider a number of factors in undertaking such an inquiry, including promises of leniency to third parties and threats made to the defendant. (*Ibid.*)

When determining the voluntariness of a plea entered pursuant to a package deal, "the nature and degree of coerciveness should be carefully examined." (*Ibarra, supra,* 34 Cal.3d at p. 289.) The *Ibarra* court explained that a trial court should carefully scrutinize pleas in which the defendant shares a special relationship with a person who has been promised a benefit contingent on the defendant pleading guilty and those cases in which a third party has threatened the defendant: "Psychological pressures sufficient to indicate an involuntary plea might be present if the third party promised leniency is a close friend or family member whom the defendant feels compelled to help. '[T]he voluntariness of a plea bargain which contemplates special concessions to another—especially a sibling or a loved one—bears particular scrutiny by a trial or reviewing court conscious of the psychological pressures upon an accused such a situation creates.' [Citation.] If the defendant bears no special relationship to the third party promised leniency, he may nevertheless feel compelled to plead guilty due to physical threat. *For example, if the third party had made a specific threat against defendant if he refused to plead guilty, the plea is likely to be involuntary.*" (*Ibid.*, italics added.) The *Ibarra* court also suggested that a plea is likely to be involuntary if the court finds that a promise of leniency to a third party was a significant consideration in the defendant's decision to plead guilty. (*Ibarra, supra,* 34 Cal.3d at pp. 289–290.)

### 3. *The trial court abused its discretion in refusing to allow Sandoval to withdraw his guilty plea on the ground that the plea was not voluntary*

A guilty plea that follows a threat of physical violence is "likely to be involuntary." (*Ibarra, supra,* 34 Cal.3d at p. 289.) Here, the trial court stated that it was "sure" Mesa had in fact threatened Sandoval immediately before Sandoval changed his mind and agreed to plead guilty. The record amply supports this finding. Sandoval had been "firm" in his insistence on going to trial for nearly a year, from the time he was arrested until the day he entered his guilty plea. He changed his mind only after a brief conversation with codefendant Mesa during which, according to Mesa, Mesa threatened Sandoval's life. Further, the trial court found that immediately after Mesa threatened Sandoval, Mesa told his attorney about the threat and Sandoval's response. The court also found that Sandoval had expressed to Attorney Vandenbosch his desire to withdraw his plea the day after he entered it.

Sandoval presented evidence that he had taken Mesa's threat seriously. Vandenbosch testified that Sandoval told her he feared he would be physically harmed if he did not plead guilty. Vandenbosch also testified that Sandoval was probably aware that Mesa had been accused of organizing an attack on another inmate. In addition, Sandoval was obviously aware that Mesa was a gang member who was accused of murder in this case.

The trial court's finding that Sandoval pled guilty partly out of a desire to act in the best interests of his fellow gang members is another factor indicating that Sandoval's guilty plea was involuntary. Although the trial court apparently believed this finding supported its determination that Sandoval's plea was *not* coerced, *Ibarra* makes clear that such a finding actually supports the conclusion that Sandoval's plea may not have been voluntary. (See *Ibarra, supra,* 34 Cal.3d at pp. 289–290.)

The trial judge's involvement in the plea negotiations also supports the conclusion that Sandoval's plea was coerced. The trial judge's remarks served to increase the psychological pressure on Sandoval stemming from his relationship with the codefendants. (See *Ibarra, supra,* 34 Cal.3d at pp. 289–290.) After each of Sandoval's codefendants stated on the record that he wished to accept the People's offer but could not do so because of Sandoval's insistence on going to trial, the judge expressed her "sympathy" for the codefendants. The court commented on Sandoval's willingness to take his codefendants "down with [him]," and noted that "maybe the gang isn't all it was cracked up to be. . . ."

Further, far from " 'maintain[ing] total neutrality' " during the plea discussions (*Weaver, supra*, 118 Cal.App.4th at p. 148), the trial judge communicated both expressly and implicitly her belief that all of the defendants should accept the plea offer. The trial judge repeatedly expressed her view that the proposed plea agreement constituted an "amazing offer." She also asked both Sandoval's attorney and his codefendants' attorneys whether there was anything she could do to be of assistance in persuading Sandoval to plead guilty.

The judge's willingness to hold chambers conferences with each defendant's attorney for the stated purpose of exploring whether the prosecutor would be willing to allow any of the defendants to plead guilty in exchange for their testimony against Sandoval could only have put additional pressure on Sandoval to plead guilty. The trial judge's setting a short deadline for Sandoval to accept the plea offer, and her observation that there was "more than sufficient evidence for a jury to convict each and every one of the defendants," further contributed to the coercion applied to Sandoval.

■ There is abundant evidence that Sandoval's guilty plea was the product of coercion. Sandoval steadfastly insisted on going to trial over a period of nearly a year, and changed his mind only after codefendant Mesa threatened his life and after the court put additional pressure on him to plead guilty. We conclude that under these circumstances, the trial court abused its discretion in refusing to allow Sandoval to withdraw his guilty plea.

B. *The trial court did not err in sentencing Sandoval pursuant to the Three Strikes law*

Sandoval claims the trial court erred in imposing a sentence pursuant to the Three Strikes law because the information did not properly allege that he had suffered a prior strike conviction.

1. *Procedural background*

On September 15, 2004, the People filed an information dated March 24, 2004.[5] This information alleged that Sandoval had suffered a prison prior and

---

[5] Sandoval filed a third motion to augment the record on appeal to include the September 15, 2004 information, and a request that we take judicial notice of this information as well as an information filed March 10, 2004. In his request for judicial notice, Sandoval acknowledged that his request for judicial notice would be moot if this court were to grant his third motion to augment the record on appeal.

On January 18, 2006, this court granted Sandoval's third motion to augment the record. The September 15, 2004 information is contained in the third augmented clerk's transcript filed on February 9, 2006. Accordingly, we deny as moot Sandoval's request for judicial notice.

a serious felony prior in connection with a conviction for a violation of section 245, subdivision (a)(1) on November 5, 1999, in case No. SCS143765.

On September 28, just prior to accepting the guilty pleas of Sandoval and his codefendants, the People amended the information to allege that Sandoval had suffered a prior strike conviction:

"The court: For the record, we have all of the defendants, and all of the attorneys. Ms. Roach [the prosecutor], you said you wanted to make an amendment to the information. Would you like to go ahead and do that at this time?

"Ms. Roach: Yes your honor. [¶] As to the allegations for the prior section for defendant Mesa, the People would add the following language: [¶] And it is further alleged that defendant Jeffrey Danielle Mesa did suffer a prior strike conviction within the meaning of Penal Code section 667 sub[division] (b) through sub[division] (i), and Penal Code section 1192.7 [subdivision] (c)(19). And that he suffered a prior conviction for attempted robbery. And, your honor, I believe both the case numbers and the dates are on the current information. [¶] If the court could transcribe those particular numbers. I apologize, I don't have a copy of the information in front of me, but it is the exact same case number, and date of conviction, and county of conviction as the serious felony prior and prison prior.

"The clerk: I have additional copies if you want.

"Mr. Skomal: I think I have the information if you want me to state it.

"The court: I just wonder if [the clerk] got it down.

"Ms. Roach: I can actually just write this in.

"The court: Could you just write it out and give it to the clerk now?

"Ms. Roach: Absolutely.

"The court: That would be good.

"Ms. Roach: Would the court also like me to make a verbal record of the other changes?

"The court: Yes, go ahead and do it in writing, and let's have you state what you did.

"Ms. Roach: Let me—

"The court: Do you want to go ahead and read it into the record as you're doing it?

"Ms Roach: Yes your honor. [¶] The language reads: It is further alleged, that Jeffrey Danielle Mesa, and Esteban Sandoval, Junior,[6] did previously suffer convictions for serious, slash, violent felonies pursuant to Penal Code section 667 sub[division] (b), sub[division] (i), in that Jeffrey Danielle Mesa suffered a prior felony conviction for violating Penal Code section 664/211 on 3-6-02 in court case number SCS166406, in the Superior Court, County of San Diego, California. [¶] And that Esteban Sandoval, Junior, did suffer a serious or violent felony pursuant to section 667 sub[division] (b) through sub[division] (i). That he was convicted of Penal Code section 245(a)(1) of assault with a deadly weapon. Date of conviction being November 5th, 1999, in court case number SCS 143765, in the Superior Court of San Diego, State of California.

"The court: Any objection to those amendments on behalf of your client, Mr. Skomal?

"Mr. Skomal: No, your honor.

"The court: On behalf of your client, Ms. Vandenbosch?

"Ms. Vandenbosch: No, your honor.

"The court: At this time, for your purposes, are you entering a denial to those allegations, on behalf of Mr. Mesa?

"Mr. Skomal: At this time.

"The court: And Ms. Vandenbosch?

"Ms. Vandenbosch: Yes.

"The court: Thank you. [¶] Your next amendment is?"

At that same hearing, while pleading guilty to one count of voluntary manslaughter (§ 192, subd. (a)), Sandoval orally admitted having incurred a strike prior stemming from a conviction in case No. SCS143765 for a

---

[6] Steven Sandoval, Jr., is referred to as Esteban Sandoval in various documents in the record. It is clear that this amendment refers to Steven Sandoval.

violation of section 245, subdivision (a)(1). Sandoval also signed a plea form in which he admitted having suffered a strike prior stemming from a conviction on November 5, 1999, in case No. SCS143765 for a violation of section 245, subdivision (a)(1). Sandoval's counsel waived a reading of the information for purposes of taking his guilty plea.

In October 2005, while this appeal was pending, Sandoval requested that the record on appeal be augmented with "[a]ny informations, amended informations, amendments to informations, or informations by interlineations that make any reference to a Three Strikes enhancement alleged against appellant." In October 2005, this court granted the request to augment the record.

On November 29, 2005, the clerk of this court filed an augmented clerk's transcript that contained an information with a handwritten notation that reads "[a]mended by interlineation 11-17-05 nunc pro tunc to 09-28-04." Next to the notation are handwritten initials that appear to read "FLD." The information contains two handwritten amendments that read:

"It is further alleged that defendant Jeffrey Danielle Mesa and Esteban Sandoval, Jr. did previously suffer convictions for serious/violent felonies pursuant to P[enal] C[ode] [section] 664 and [section] 211 on 3-6-02 in court case number SCS166406. Superior Court, County of San Diego, CA.

"And that Esteban Sandoval, Jr. did suffer a serious or violent felony pursuant to P[enal] C[ode] 667 [subdivision] (b)–(i) i[n] that he was convicted of P[enal] C[ode] 245 [subdivision] (a)(1) of assault with a deadly weapon. Date of conviction being November 5, 1999, in court case SCS143765. Superior Court County of San Diego, CA."

Next to the amendments are the same handwritten initials that are contained on the first page of the information, which appear to read "FLD." The information does not bear a file stamp.

On December 28, 2005, Sandoval filed an unopposed request to strike the November 29, 2005 augmented clerk's transcript from the record on appeal. Sandoval also requested that this court order the superior court to strike from the superior court file the information containing the handwritten notations. In support of his request, Sandoval's attorney filed a declaration in which he stated that he spoke with the trial court's clerk, F. Lynn Drake. Drake acknowledged that he drafted the handwritten amendments to the information contained in the November 29, 2005 augmented clerk's transcript. Drake explained that he obtained an unconformed copy of an information from the district attorney, reviewed the transcript of the September 28, 2004 proceedings, drafted the purported amendments to the information, initialed the

information, drafted the caption to the information, and placed the information in the file indicating that it was filed "nunc pro tunc" to September 28, 2004. Drake acknowledged that he did not obtain the court's approval before taking these actions.

 2. *The November 2005 information is ordered stricken from the record on appeal and from the superior court file*

 We are aware of no authority that would authorize the clerk's actions in drafting the November 2005 amended information in this case. Most fundamentally, there is nothing on the face of the information, nor in the record, that indicates that the trial court authorized the clerk's actions. Moreover, it is not clear whether the clerk recreated a document that had been filed but was subsequently lost, or rather, created a document that should have been filed but never was. If the People in fact filed a written information that was amended by interlineation on September 24, 2004, and that information was subsequently lost, the *trial court* had the authority to order that a copy of the information be placed in the file. (§ 973 ["If the accusatory pleading in any criminal action has heretofore been lost or destroyed or shall hereafter be lost or destroyed, the court must, upon the application of the prosecuting attorney or of the defendant, order a copy of such pleading to be filed and substituted for the original, and when filed and substituted, as provided in this section, the copy shall have the same force and effect as if it were the original pleading"].) If no such pleading was filed, it was clearly not within the authority of the clerk to draft such a pleading and "order" the document filed nunc pro tunc to September 28, 2004.

 Finally, the written information as amended by Drake does not conform entirely with the prosecutor's oral amendments to the information made on September 28, 2004. For example, the written information alleges that Sandoval previously suffered serious or violent felony convictions in case Nos. SCS166406 and SCS143765. The prosecutor orally alleged only that Sandoval suffered a strike conviction in case No. SCS143765.

 Accordingly, we order the information "amended by interlineation 11-17-05 nunc pro tunc to 09-28-04" contained in the November 29, 2005 augmented clerk's transcript stricken from the record on appeal and direct the trial court to strike the information from the superior court's file.[7]

---

[7] On December 28, 2005, Sandoval also filed a request to correct the December 1, 2005 augmented clerk's transcript. Specifically, Sandoval requested that the record be corrected to omit the information containing the handwritten notations. In view of our conclusion granting Sandoval's request to strike the information containing the handwritten amendments, we deny his motion to correct the record as moot.

### 3. *The People's oral amendment of the information adequately alleged that Sandoval had suffered a prior strike conviction*

We assume for purposes of our decision that before a trial court may impose a sentence based on a prior conviction under the Three Strikes law, the People are required to allege that a defendant has suffered such a prior strike conviction.

Section 969a authorizes amendments to an accusatory pleading for the purpose of alleging a prior felony conviction. "Whenever it shall be discovered that a pending indictment or information does not charge all prior felonies of which the defendant has been convicted either in this State or elsewhere, said indictment or information may be forthwith amended to charge such prior conviction or convictions, and if such amendment is made it shall be made upon order of the court, and no action of the grand jury (in the case of an indictment) shall be necessary." (§ 969a.) Section 969a does not expressly require that the amendment be in written form.

■ "An accusatory pleading['s] . . . purpose is to provide the accused with reasonable notice of the charges." (*People v. Ruiloba* (2005) 131 Cal.App.4th 674, 689–690 [31 Cal.Rptr.3d 838].) Defects in the form of an accusatory pleading are not a ground to reverse a criminal judgment in the absence of significant prejudice to a defendant. (§ 960 ["No accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits"].)

We are aware of no authority, and Sandoval has cited none, that suggests that a criminal judgment may not be premised upon an information that has been orally amended. In a number of cases, courts have noted that an information was orally amended. (See, e.g., *Donaldson v. Department of Real Estate* (2005) 134 Cal.App.4th 948, 951 [36 Cal.Rptr.3d 577] ["About a month later, licensee entered a no contest plea to unlawful intercourse with a minor, a felony, and contributing to the delinquency of a minor, a misdemeanor which the information had been orally amended to charge"]; *People v. Wallace* (2003) 109 Cal.App.4th 1699, 1701 [1 Cal.Rptr.3d 324] ["Pursuant to a negotiated disposition, the prosecution orally amended the information to allege a violation of section 422.7"]; *People v. Hickey* (1980) 109 Cal.App.3d 426, 432 [167 Cal.Rptr. 256] ["On the motion of the district attorney, and over the strenuous objection of appellant's trial counsel, the information was orally amended to plead both priors as 'violent' felonies within the meaning of section 667.5, subdivisions (a) and (c)"].)

The informal amendment doctrine makes it clear that California law does not attach any talismanic significance to the existence of a written information. Under this doctrine, a defendant's conduct may effect an informal amendment of an information without the People having formally filed a written amendment to the information. (See *People v. Rasher* (1970) 3 Cal.App.3d 798, 800, 803 [83 Cal.Rptr. 724] [concluding, "defendant was properly convicted of an offense with which he was not, but could have been [citation] formally charged in the information" where defendant's conduct in requesting certain jury instructions "accomplish[ed] an informal amendment of the information"]; *People v. Hensel* (1965) 233 Cal.App.2d 834, 839 [43 Cal.Rptr. 865], disapproved on another ground by *People v. Triggs* (1973) 8 Cal.3d 884, 894, fn. 7 [106 Cal.Rptr. 408, 506 P.2d 232] [concluding, in case where defendant asked court to reduce his offense to violation of lesser, but not included, offense, defendant impliedly consented that information be treated as though another similar lesser offense had been charged].)

*People v. Estrada* (1960) 185 Cal.App.2d 435 [8 Cal.Rptr. 308] (*Estrada*), upon which Sandoval relies, is not to the contrary. In *Estrada*, the People charged defendant in an information with possession of marijuana. At trial, the People moved to amend the information to charge the defendant with possession of heroin (*id.* at p. 439), but never filed a written information charging defendant with possession of heroin. (*Ibid.*) The court rejected the defendant's argument that the People's failure to file a written information alleging possession of heroin entitled him to a reversal of the judgment.

"Assuming that the granting of the amendment, in and of itself, did not give the proposed amendment the dignity of 'a writing,' appellant's argument ignores the very basis upon which a reversal for a variance can be granted. It is true that the evidence presented in a criminal case must correspond with the allegations of the indictment; but a variance, to be reversible error, must be material [citation]. The test of materiality is predicated 'upon the requirements that the accused shall be definitely informed as to the charges against him, and that he may be protected against another prosecution for the same offense' [citations].

"It is clear that appellant was at all times aware of the precise nature of the charge against him. He knew that the narcotics involved [were] heroin because the People's chemist so testified at the preliminary hearing. It is to be remembered that by stipulation the cause was submitted on the testimony contained in the transcript of the preliminary hearing, each side reserving the right to offer additional evidence. Appellant knew of the variance between the information and the proof because the motion to amend was made in open court. Appellant requested no continuance and offered no objection to the amendment. It cannot now be contended that he was prejudiced since he was

definitely informed as to the charges against him . . . ." (*Estrada, supra,* 185 Cal.App.2d at pp. 439–440.)

■ Although the *Estrada* court *assumed,* but did not decide, that a *motion* to amend an information did not constitute a written amendment to the information the court did not address whether, as in this case, an oral amendment to an information offered in open court with the defendant present, constitutes an effective amendment to an information. *Estrada* does make clear, however, that the touchstone of determining the adequacy of an accusatory pleading is whether the defendant had adequate notice of the charges against him.

In this case, the People orally amended the information to allege the strike prior in open court, in the presence of Sandoval and his attorney. Sandoval's attorney stated that she had no objection to the amendment, and denied the allegation contained in the orally amended information. This refutes Sandoval's contention in his brief that the record reveals only an "oral expression of an intention to file an amended pleading." At the same hearing, Sandoval orally admitted having incurred the strike prior and filed a signed plea form in which he admitted having suffered the strike prior.

The record is thus clear that Sandoval had reasonable notice of the prior strike allegation and that any defect in the form of the allegation did not prejudice Sandoval. Accordingly, we conclude that the oral amendment of the information adequately alleged that Sandoval had suffered a prior strike conviction.[8]

IV.

DISPOSITION

The judgment is reversed and the matter is remanded to the trial court. In the interest of justice, the matter shall be reassigned to a different judge. The trial court is directed to strike from the superior court file the information "amended by interlineation 11-17-05 nunc pro tunc to 09-28-04."

The trial court shall allow Sandoval to file a new motion to withdraw his guilty plea. Any such motion shall be filed within 60 days after the issuance of the remittitur. If Sandoval requests additional time to file a motion to withdraw his plea, the court may grant the request for good cause, at its discretion.

---

[8] In light of our conclusion, we need not consider the People's argument that Sandoval forfeited his claim by failing to raise it in the trial court.

If Sandoval timely files a motion to withdraw his plea of guilty, the court is directed to grant the motion and allow Sandoval to withdraw his guilty plea. If Sandoval does not timely file a motion to withdraw his guilty plea, the trial court shall reinstate the judgment.

McConnell, P. J., and Huffman, J., concurred.

On June 22, 2006, the opinion was modified to read as printed above.