Filed 8/20/14  P. v. Jackson CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B245779 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA356428) |
| LONDRA DEMORE JACKSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anne H. Egerton and Barbara R. Johnson, Judges.  Reversed and remanded.

Angelyn Gates for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb, and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Londra Demore Jackson appeals from the judgment entered following his no contest plea to first degree residential burglary and admission he had suffered a prior serious or violent felony conviction within the meaning of the three strikes law and had served a prior prison term for a felony. Jackson contends he should have been permitted to withdraw his plea before sentence was imposed pursuant to Penal Code section 1018[1] because the trial court and his privately retained counsel had coerced him to plead and someone else had confessed to the crime after his plea was entered. We reverse and remand for a new hearing on Jackson's motion to withdraw his plea.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Preliminary Hearing*

Los Angeles Police Officer Luis Bonilla testified he interviewed Michael Turner, the victim of a residential burglary, on April 24, 2009 at Turner's house. Turner reported he had left home that day at 3:30 p.m., returning an hour later to discover it had been ransacked. Several items were missing, including money and a nine-millimeter handgun.

When Officer Bonilla arrived at approximately 4:30 p.m., he saw Jackson walking down a driveway just east of Turner's house. Jackson turned toward the patrol car and appeared startled or nervous. He then turned away and walked through the front yard of another home and quickly down the driveway. As Bonilla got out of his car, Jackson walked toward the rear of a truck parked in the driveway and appeared to discard something. He then began running. Bonilla pursued Jackson but lost sight of him after he jumped over a wall. Bonilla and his partner requested backup units and a helicopter.

Officer Monterosso arrived and was told to investigate the area near the truck where Jackson had appeared to discard something. Monterosso found a pair of gloves and a nine-millimeter handgun.[2] The officers' onboard computer identified Turner as the gun's owner, and it was returned to him. A K-9 dog found Jackson hiding under a vehicle in the driveway of a nearby home on South Halldale Avenue.

---

[1]     Statutory references are to the Penal Code.

[2]     Bonilla believed another officer recovered two $100 bills and a $10 bill.

2

Thelma Parham testified she discovered Jackson in a back room of her home on South Halldale Avenue at approximately 4:00 or 4:30 p.m on April 24, 2009.  After she demanded an explanation, Jackson said the window was open and, "'They're shooting at me.'"  Parham ordered Jackson to leave.

2. *The Information; Jackson's Failure To Appear; the Amended Information*

Jackson was charged in an information filed April 27, 2010 with residential burglary (§ 459), possession of a firearm by a felon (former § 12021, subd. (a)(1), now § 29800, subd. (a)), misdemeanor aggravated trespass (§ 602.5, subd. (b)) and misdemeanor resisting a peace officer (§ 148, subd. (a)(1)).  The information specially alleged Jackson had suffered two prior serious or violent felony convictions for robbery and burglary within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and had previously served four separate prior prison terms for felonies (§ 667.5, subd. (b)).  Jackson pleaded not guilty and denied the special allegations.

On July 9, 2010 the trial court denied Jackson's section 995 motion to dismiss the burglary and possession of a firearm charges.  Jackson was ordered to appear on August 6, 2010 for a pretrial conference.  After Jackson failed to appear, the trial court ordered his bond forfeited and bail revoked and issued a bench warrant.  At a bench warrant hearing on December 17, 2010 the court was informed Jackson had been taken into custody.  Bail was set at $3,000,000, and the matter scheduled for hearing.  At the December 20, 2010 hearing Christopher Darden substituted in as privately retained counsel for Jackson.

An amended information was filed May 18, 2011 adding the special allegation Jackson had suffered two prior serious or violent felony convictions for robbery and burglary within the meaning of section 667, subdivision (a)(1).  Jackson again pleaded not guilty and denied the special allegations.

3. *Jackson's No Contest Plea*

a. *Rejection of the 15-year deal*

On Friday, May 27, 2011 the matter was called for trial.  Jackson, who was facing a 25-year-to-life sentence as a third strike offender if convicted on all charges, was

3

offered a plea deal of 15 years in state prison.  The court stated, "I know Mr. Darden has been talking to you for a long time.  I do not need to tell you, he's a very experienced criminal defense attorney and before that, a very successful district attorney for a lot of years. . . .  You can roll the dice and go to trial—and I have not heard any evidence, I'm not prejudging anything—but it's my job to tell you that if you get convicted, you're looking at a life sentence with a minimum eligible parole date of at least 25.  I would encourage you to really consider their offer of 15, which, to my understanding, because it's a serious one, a violent felony, you would . . . do about 80 percent of that time."

Jackson asked for time to think about the offer and discuss it with his family.  He explained he did not think Darden, who had been too busy to talk to him, was prepared for trial and they were "having a conflict" about his defense.  Jackson also said he was overwhelmed by having learned his daughter was comatose in the hospital and had been "begging" to see her.

Darden informed the court he was "absolutely ready" and had "read every page of everything":  "I know exactly what I want to do.  I have my motions in limine; I have a motion to strike his strike; I have a motion to bifurcate his priors; and God knows how many jury trials I've done.  I'm ready to go.  I understand the evidence code and exactly what the issues are in this case."  Darden also explained he had tried to get a better offer, but the nature of the case had changed:  Until the previous day the People had been unable to confirm the victim's willingness to testify.  Darden said, "I would not risk my son's or brother's life given the evidence as I know it and understand it in a case like this.  I would tell them to take the 15.  I've told Mr. Jackson he should take the 15."

Jackson asked to continue the case until the following Tuesday (the next court day).  The court denied the request:  "I know you feel pressed, but the case is two years old.  It is in part old because you absented yourself from the court's processes.  Today is the 13th date that I've had this case here for trial. . . .  We have had pretrial after pretrial after pretrial, and I'm confident Mr. Darden is ready.  The People are certainly ready.  They've subpoenaed numerous witnesses and I've been assigned to start the trial today by my supervising judge.  So if you would like to talk to Mr. Darden some more in the

back, or you can talk to him right here and [the Prosecutor] and I will get up and go somewhere else together." Darden then asked, "Mr. Jackson, would he be allowed to go see his daughter now at the hospital?" The court replied, "Well, I'm happy to sign the order. I've signed it again. I'm happy to call whatever supervisors I can call at the sheriff's department to try to make it happen." The court later cautioned, "I really think he should be making this decision independent of the situation with his daughter. I do not want to have some issue down the road that there was some kind of duress."

After further discussion about whether Jackson might be given a bail reduction or a 30-day release on his own recognizance so he could visit his daughter, notwithstanding he had previously failed to appear as ordered, the court reiterated, "I think he needs to make a judgment about the risk of going to trial versus the People's offer independently of this very sad situation with his daughter, because they're separate issues and I think he needs to evaluate the 15-year offer and make a judgment on that just based on the risk of going to trial versus the offer."

Immediately thereafter Jackson declined the offer. When the People emphasized the offer would not be available on Tuesday when jury selection began, Jackson asked for "something under 10" and told the court he did not know what to do. After more colloquy, with Jackson asking for a better deal or to postpone the decision until Tuesday and refusing to confirm whether he would accept the plea deal, the court and attorneys began discussing pretrial matters until the proceedings were adjourned for the day.

b. *Acceptance of the 17-year deal*

At the outset of the proceedings on Tuesday, May 31, 2011, Jackson asked whether he could "still" have until 1:30 p.m. to decide to take the 15-year plea deal. After the prosecutor said that deal was no longer available, the court adjourned the proceedings until 1:30 p.m., stating jury selection would begin if the People did not make a new offer. When proceedings resumed, the People had made a 17-year offer but Jackson asked to address the court. Jackson complained he continued to have issues with Darden. According to Jackson, Darden had called him a "stupid-ass nigger" because he "was not too smart for not taking this deal" and Darden had failed to retest the gloves

5

found at the crime scene, which had Jackson's DNA on them, as Jackson had requested. Jackson further explained, "Before I take the deal, Your Honor—I'm just feeling like I'm almost forced into taking it because I haven't had a proper defense counsel in this. I don't have no choice. If I go to trial, he's guaranteeing me I'll lose, so how do I go to trial with confidence [in] my attorney? He has no confidence in me."

After the court observed Jackson appeared to be seeking to delay the matter and indicated trial would proceed, Darden asked to withdraw as counsel because Jackson suggested he had committed misconduct or had otherwise been ineffective. The court denied the request. Following protracted colloquy during which Jackson requested the 15-year plea deal, he accepted a 17-year offer to plead guilty to residential burglary and admit one prior conviction as a strike and within the meaning of section 667, subdivision (b). Jackson, however, was uncooperative while the People and the court were advising him of his rights and the nature and consequences of his proposed plea and ensuring his plea and waivers were voluntary, knowing and intelligent. For example, when the court asked Jackson whether he understood he had the right to a trial, he replied, "Yes, I do, your Honor, but I thought I had the right to a fair trial and I'm not understanding." Jackson finally cooperated after the court told him several times the jurors would be brought in if he continued to equivocate. The court found he had voluntarily, knowingly and intelligently waived his constitutional rights and entered his plea. A sentencing hearing was set for June 30, 2011.

4. *Darence Atkin's Confession; Jackson's Efforts to Withdraw His Plea; the Transfer of the Case*

Sentencing was continued first to August 30, 2011 and then to October 6, 2011 at defense counsel's request. On September 19, 2011 defense counsel was provided with a police report describing an interview with Darence Atkins,[3] who had walked into the police station on August 9, 2011 and confessed to committing the burglary of Turner's home with a friend (not Jackson). The detective who interviewed Atkins did not find him

---

3    Darence Atkins's name is spelled differently throughout the record. We use the spelling on the signature line of his declaration.

credible. On September 29, 2011 Jackson moved to compel production of the audio recording of the interview, which the trial court granted.

On October 20, 2011, after several more continuances, Jackson moved to withdraw his plea, arguing it was not knowingly and intelligently made because he had not known of all the potentially meritorious defenses available. On December 7, 2011 Jackson filed a declaration from Atkins in support of the motion. Atkins declared he came forward because he had learned Jackson was being sent to prison for the crime Atkins had committed and he wanted to clear his conscience. He described how he committed the crime, including writing notations on several photographs of the crime scene that were attached to his declaration. Atkins stated he did not recall ever seeing Jackson and had not received any threats, benefits or promises in connection with providing his declaration.

Atkins was present at the December 7, 2011 sentencing hearing, as he had been at several of the prior sentencing hearings, in case the People wanted to interview him. The prosecutor declined to do so. The court then explained its tentative decision to deny Jackson's motion to withdraw his plea without hearing testimony from Atkins, whose credibility the court questioned. After hearing argument, including defense counsel's suggestion "people, perhaps, receive stolen property all the time" and assertion there was no evidence placing Jackson inside Turner's home, the court agreed to continue the case until December 12, 2011 to hear testimony from Atkins. On December 9, 2011 Darden filed a supplement to Jackson's motion to withdraw his plea in which he explained his belief Jackson may be innocent and, under all the circumstances including his daughter's condition, may have been coerced to enter a no contest plea, which Darden would not have recommended if he had known of Atkins.

The hearing on Jackson's motion was repeatedly continued. In early January the court was informed Atkins had been taken into custody in connection with another incident. By the February 9, 2012 hearing, Atkins had been released but could not be found.

In mid-April 2012 Jackson petitioned for a writ of habeas corpus after the People had argued in opposition to his motion to withdraw his plea that newly discovered evidence may be grounds for a writ petition, but not a motion to withdraw a plea under section 1018. At the May 17, 2012 hearing the court asked Jackson if he wanted counsel appointed because his petition raised questions about Darden's representation. Jackson responded he would retain a lawyer to consult with him whether Darden should be replaced. The court continued the matter and indicated it would also determine if the matter should be transferred to another judge to hear the petition: "I'm kind of a witness to all this, too, so maybe I shouldn't even be hearing it."

At the June 8, 2012 hearing Darden was relieved as counsel of record. The writ petition was withdrawn at the request of Jackson's new attorney to give him an opportunity to review the matter. Sentencing was continued until July 25, 2012 and then four additional times until October 15, 2012.

On October 10, 2012 Jackson again moved to withdraw his plea pursuant to section 1018, arguing four factors had overcome his ability to exercise free judgment in deciding to plead no contest: Conflict with and mistrust of counsel; judicial duress; emotional distress; and ignorance of existing evidence (new evidence). Jackson requested another bench officer be assigned to hear the motion if the court was not willing to grant it without a hearing.

5. *Denial of Jackson's Motion to Withdraw His Plea*

On October 31, 2012 the matter was transferred from Judge Anne H. Egerton to Judge Barbara R. Johnson. At the outset of the December 7, 2012 hearing on the motion, the court expressed its tentative view Jackson had not been subjected to duress when he entered his plea and suggested argument be directed to the effect of Atkins's confession. The prosecutor argued Atkins was not credible and the People would be prejudiced if Jackson was permitted to withdraw his plea because Turner had been a difficult witness, only agreeing to cooperate when he thought he would be held in contempt of court if he did not.

8

Defense counsel argued the mere existence of Atkins's confession entitled Jackson to withdraw his plea and it was not the trial court's role to determine whether Atkins was credible. Stressing Jackson's daughter's poor health, the breakdown in communication between Jackson and Darden and pressure from the trial court, defense counsel maintained it would be a miscarriage of justice not to allow Jackson to withdraw his plea and go to trial.

The trial court rejected Jackson's argument it was not the court's role to determine the credibility of the new evidence, likening the proceeding to a hearing on a writ petition. The court then stated, "There's no declaration from anybody except for the police report, and that's not a declaration of anything about this case." The prosecutor corrected the court, indicating he believed Atkins's declaration had been submitted; and defense counsel said he remembered there was a declaration from someone, but did not recall if it was from Darden. The court checked the file, but only found the police report, which the prosecutor then said might be what he was remembering. Defense counsel apparently checked as well, stating, "Your Honor, I don't see a declaration from Mr. Atkins. I believe there was a declaration from Mr. Darden about the information . . . ."

The trial court denied Jackson's motion, finding none of the facts purporting to show duress constituted clear and convincing evidence supporting withdrawal of his plea. With respect to Atkins's confession the court found, "I don't think that the new evidence has been shown. There's a police report. There's apparently a declaration somewhere from Mr. Darden. I read the police report . . . . But, I think after a trial, after a plea[] . . . that I need to consider the veracity of the person who's claiming this new evidence, whether it's by a plea or by a trial."

# DISCUSSION

## 1. *Governing Law*

A defendant may move to set aside a guilty or no contest plea for good cause at any time before the entry of judgment. (§ 1018.)[4] Good cause includes mistake, ignorance, fraud, duress or any other factor that overcomes the defendant's exercise of free judgment and must be shown by clear and convincing evidence. (*People v. Cruz* (1974) 12 Cal.3d 562, 566; *People v. Breslin* (2012) 205 Cal.App.4th 1409, 1416.) It is not enough that a defendant has concluded he or she wrongly assessed the wisdom of the plea bargain or otherwise has had a change of mind. (*People v. Knight* (1987) 194 Cal.App.3d 337, 344.) Even "[t]he fact [a defendant] may have been persuaded, or was reluctant, to accept the plea is not sufficient to warrant the plea being withdrawn. [Citation.] 'Guilty pleas resulting from a bargain should not be set aside lightly and finality of proceedings should be encouraged.'" (*People v. Ravaux* (2006) 142 Cal.App.4th 914, 919.) However, "[t]rial courts are expressly directed to give a liberal construction to the provisions of section 1018 in the interest of promoting justice." (*People v. Superior Court* (*Giron*) (1974) 11 Cal.3d 793, 796.)

A decision to deny a motion to withdraw a guilty or no contest plea rests in the sound discretion of the trial court and is final unless the defendant can show a clear abuse of discretion. (*People v. Superior Court* (*Giron*), *supra*, 11 Cal.3d at p. 796.) We are required to accept the trial court's factual findings if they are supported by substantial evidence (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1254) and witness credibility determinations if reasonably justified by the record (see *People v. Quesada* (1991) 230 Cal.App.3d 525, 533).

---

[4] Section 1018 provides, "On application of the defendant at any time before judgment . . . the court may, . . . for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted. . . . This section shall be liberally construed to effect these objects and to promote justice."

## 2. *The Trial Court Did Not Abuse Its Discretion in Denying Jackson's Motion To Withdraw His Plea Based on Duress*

### a. *The trial court did not coerce Jackson to enter a plea*

Jackson contends the trial court coerced him to plead no contest by repeatedly telling him to accept the offer, asking the prosecutor to make a better offer, passively threatening him with a life sentence and telling him it would sign an order allowing him to see his daughter—promising to do what it could "to make it happen"—if he agreed to the negotiated plea.

Although California law does not prohibit judicial involvement in plea negotiations, a judge's participation in plea discussions may improperly influence a defendant's decision to accept a plea agreement. "[W]hen the trial court abandons its judicial role and thrusts itself to the center of the negotiation process and makes repeated comments that suggest a less-than-neutral attitude about the case or the defendant, then great pressure exists for the defendant to accede to the court's wishes." (*People v. Weaver* (2004) 118 Cal.App.4th 131, 150 (*Weaver*).) Nonetheless, not every instance of judicial involvement in plea negotiations is coercive or leads to a plea that is the product of duress. (*Id*. at pp. 149-150.) "Judges can, in appropriate cases and in a reserved manner, play a useful part in that process." (*Id*. at p. 150.)

In *Weaver*, a child molestation case, the trial judge "went too far," "[a]t any given time . . . seem[ing] to fill the role of judge, jury, defense counsel, prosecutor, psychiatrist, social worker and victims' advocate." (*Weaver*, *supra*, 118 Cal.App.4th at p. 149.) The judge repeatedly urged the defendant to accept the prosecution's plea offer; said he thought the defendant would likely be convicted and was a pedophile in denial; stated he did not want to see the girls "'victimized' again" by having to testify; and indicated he would admit evidence of uncharged acts with the victims and 24 images of child pornography found on the defendant's computer— "'damning' and 'overwhelming'" evidence the judge described as an ugly, smelly monster with warts and "'green stuff dripping from its mouth and the horns'" that would be brought "'into the courtroom and put . . . on that table [to] puke all over the place and crap all over the place. . . .'"

11

(*Weaver, supra,* 118 Cal.App.4th at pp. 135-138.) The Court of Appeal reversed the denial of Weaver's motion to withdraw his guilty plea based upon the coercive comments of the trial judge during plea negotiations. (*Id.* at p. 136.)

Here, unlike in *Weaver*, the trial court's remarks were neutral. The court impartially and realistically advised Jackson of the sentence he would receive if he were convicted, including actual time likely to be served, specifically observing it had not heard the evidence and was not "prejudging anything." The court did not express an opinion regarding Jackson personally or his likelihood of being convicted. The court did not urge Jackson to accept the plea, but merely told him to seriously consider it, and only pressed him for a decision after he repeatedly asked for more time to decide or for a different deal; changed his mind; and then refused to cooperate during the entering of his plea.

Jackson's contention the court took advantage of his vulnerable family situation by stating it would sign the order permitting him to visit his daughter if he accepted the deal is disingenuous. On May 27, 2011, after the court told Jackson he had to make a decision whether to accept the 15-year plea offer and permitted him an opportunity to consult with Darden, Darden asked whether Jackson would be permitted to visit his daughter. The court responded it was "happy to sign the order" and "call whatever supervisors I can call at the sheriff's department to make that happen" in direct response to the question. Jackson, however, pressed for a bail reduction if he were willing to enter a plea. The court then admonished Jackson to make the decision whether to accept the plea "independent of the situation with his daughter" so there was no "issue down the road that there was some kind of duress." Shortly thereafter the court reiterated Jackson should evaluate the plea offer compared to the risk of going to trial independently of the "sad situation" with his daughter. Under no stretch of the imagination can this be construed as the court conditioning Jackson's ability to see his daughter on acceptance of the plea offer.

Jackson's argument he was forced to accept the plea because the court did not permit him to discharge Darden or adequately inquire into their conflict is similarly

12

without merit. A nonindigent defendant's right to discharge retained counsel with or without cause "is not absolute. The trial court, in its discretion, may deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]." (*People v. Ortiz* (1990) 51 Cal.3d 975, 983.) The court's denial of Darden's request to withdraw as untimely was amply justified here: The case had been pending for a substantial period of time, in part because Jackson had fled; and trial was scheduled to start that day with witnesses subpoenaed, defense counsel declaring he was fully prepared and potential jurors awaiting voir dire.[5] (See *People v. Keshishian* (2008) 162 Cal.App.4th 425, 429 [trial court did not abuse discretion in denying defendant's request to discharge counsel on day set for trial after case pending two and a half years; "[t]hat appellant had inexplicably 'lost confidence' in his experienced and fully prepared counsel did not constitute good cause for granting the continuance requested, nor justify the disruption to the judicial process that would have ensued"].) The court did not "summarily and off-handedly" reject the suggestion of substitute counsel as Jackson contends. Darden's request to withdraw was denied after extensive colloquy during two hearings in which the court listened to Jackson's complaints and Darden's explanation he was fully prepared for trial; the court summarized the lengthy history of the case supporting its view Jackson had attempted to expedite trial while the People could not secure Turner's presence and then sought to delay it after a bench warrant was issued for Turner and his appearance as a witness assured.

b. *Defense counsel did not coerce Jackson to enter a plea*

A defendant who claims he or she was "subject to undue pressure" to accept a plea must demonstrate it was more "pressure than every other defendant faced with serious

---

[5]    Indeed, Jackson's dissatisfaction with Darden had been steeping for many months. As Jackson explained, "[F]or the past six months, your Honor, I've been expecting to get a result from a glove, not from somebody's paperwork." Whatever the reason for Jackson's failure to pursue a change of counsel earlier, however, the request was simply untimely on the day of trial.

felony charges and the offer of a plea bargain." (*People v. Huricks* (1995) 32 Cal.App.4th 1201, 1208.) "Lawyers and other professional [people] often persuade clients to act upon advice which is unwillingly or reluctantly accepted. And the fact that such advice is unwillingly or reluctantly acted upon is not a '. . . . factor overreaching defendant's free and clear judgment' of what should be done to find a means to alleviate the situation with respect to which the client seeks advice." (*People v. Urfer* (1979) 94 Cal.App.3d 887, 892 [defendant's reluctance to follow the advice of his attorney was not a "'factor overreaching defendant's free and clear judgment'"].)

Jackson primarily contends his belief Darden was unprepared for trial and Darden's failure to discuss his defense strategy with Jackson unduly influenced him to accept the plea offer. The trial court, however, found Darden was prepared for trial, and its assessment of Darden's credibility is reasonably justified by the record. Darden's emphatic recommendation Jackson should take the 15-year plea offer—that he "would not risk [his] son's or brother's life given the evidence" in the case at that time—was based on Officer Bonilla's preliminary hearing testimony, which strongly implicated Jackson: Bonilla saw Jackson walking hurriedly down the driveway of a house near Turner's almost immediately after the burglary had been reported; Jackson appeared to discard items that were later discovered to be a gun stolen from Turner and gloves with DNA that matched Jackson's. As Darden later told the court, had he known Atkins would later confess he likely would not have recommended Jackson accept the plea. But the state of the evidence at the time Darden advised Jackson to accept the 15-year plea offer, compared to the risk of a 25-year-to-life sentence, fully justified Darden's strongly worded recommendation that Jackson accept the offer.[6]

---

6    Under no circumstances was it appropriate for Darden, if true, to call Jackson "a stupid-ass nigger" for not wanting to accept the offer. Even if the comment reflected Darden's deeply held belief, based on years of experience in criminal law, that Jackson would be best served by accepting the plea, it was offensive and improper.

14

### 3. *The Matter Must Be Remanded To Determine Whether Jackson Should Be Permitted To Withdraw His Plea Based on Atkins's Confession*

#### a. *Clear and convincing newly discovered evidence of factual innocence is a proper ground for withdrawing a guilty plea*

Ordinarily, in considering a motion to withdraw a guilty or no contest plea, "'the doctrines of "presumptive innocence" and "proof beyond a reasonable doubt" are inapplicable, since the defendant had already admitted his guilt by his plea of guilty.'" (*People v. Nance* (1991) 1 Cal.App.4th 1453, 1457.) "'A plea of guilty, of course, is the most serious step a defendant can take in a criminal prosecution. . . . [B]ecause there will be no trial the plea strips the defendant of such fundamental protections as the privilege against self-incrimination, the right to a jury, and the right of confrontation. [Citations.] As to the merits, the plea is deemed to constitute a judicial admission of every element of the charged offense. . . . [Citation.] Finally, it severely restricts the defendant's right to appeal from the ensuing judgment." (*People v. Voit* (2011) 200 Cal.App.4th 1353, 1363-1364.)

Nonetheless, "''' the withdrawal of a plea of guilty should not be denied in any case where it is in the least evident that the ends of justice would be subserved by permitting the defendant to plead not guilty instead; and it has been held that the least surprise or influence causing a defendant to plead guilty when he has any defense at all should be sufficient cause to permit a change of plea from guilty to not guilty.'''" (*People v. Ramirez* (2006) 141 Cal.App.4th 1501, 1507 (*Ramirez*); accord, *People v. McGarvy* (1943) 61 Cal.App.2d 557, 564.) Accordingly, although not typically listed as an instance of "good cause" that will support a motion to set aside a guilty or no contest plea pursuant to section 1018, perhaps because it so rarely occurs,[7] a defendant should be permitted to withdraw his or her plea before judgment if there is sufficiently compelling new evidence of factual innocence. (See *People v. Singh* (1957) 156 Cal.App.2d 363,

---

[7] Although case law generally identifies good cause under section 1018 to include mistake, ignorance, fraud, duress "or any other factor overcoming the exercise of free judgment" (e.g., *People v. Cruz, supra*, 12 Cal.3d at p. 66), no case has excluded newly discovered evidence of factual innocence as a ground for withdrawal of a guilty plea.

366 [trial court did not abuse its discretion in denying motion to withdraw plea based on newly discovered evidence negating element of crime because defendant offered no affidavits and failed to establish grounds for motion by clear and convincing evidence]; cf. *In re Crumpton* (1973) 9 Cal.3d 463, 468 [notwithstanding general principle pleas should not be overturned lightly, defendant "should not be condemned to life imprisonment simply because he pleaded guilty under a mistaken legal understanding of the kidnapping statute"]; see also § 1018 ["[t]his section shall be liberally construed . . . to promote justice"].)

Newly discovered evidence, of course, is expressly identified as a ground for granting a new trial pursuant to section 1181, subdivision 8, when the evidence proffered is such as to render a different result probable on a retrial of the case (*People v. Verdugo* (2010) 50 Cal.4th 263, 308), based upon the trial court's evaluation of both its materiality and credibility.  (*People v. Delgado* (1993) 5 Cal.4th 312, 328-329; see *People v. Williams* (1962) 57 Cal.2d 263, 274-275 [although claim of newly discovered evidence as a ground for a new trial is "uniformly 'looked upon with disfavor,'" when the "'newly discovered evidence' contradicts the 'strongest evidence introduced against' defendant [citation] and comes from an unexpected source [citation], it would appear proper that defendant should have the opportunity of trying to present such evidence for the consideration of the trier of the facts"].)  And federal courts, applying rule 11(d)(2) of the Federal Rules of Criminal Procedure, which authorizes a court to allow the defendant to withdraw a plea of guilty or nolo contendere before imposition of sentence if "the defendant can show a fair and just reason for requesting the withdrawal," have recognized newly discovered evidence "that at least could have plausibly motivated a reasonable person in [the defendant's] position not to have pled guilty had he known about the evidence prior to pleading" as a proper ground for withdrawal of a plea.  (See *U.S. v. Garcia* (9th Cir. 2005) 401 F.3d 1008, 1011-1012 ["the generous 'fair and just reason' standard does not require that the defendant show that the new evidence exonerates him or that there is a reasonable probability he would not have been convicted had the case gone to trial"]; *U.S. v. Groll* (7th Cir. 1993) 992 F.2d 755, 758 ["when

16

assertions of innocence are substantiated by evidence, the district court must do more than simply deny the motion out of hand: a court must either permit the defendant to withdraw her plea and go to trial, conduct an evidentiary hearing on the matter or deny the motion with an explanation as to why the evidence is insufficient or incredible"].)

*Ramirez*, *supra*, 141 Cal.App.4th 1501, although distinguishable, supports our conclusion clear and convincing evidence of factual innocence constitutes good cause under section 1018. In *Ramirez* defense counsel discovered a previously undisclosed supplemental police report after the defendant had pleaded no contest to armed robbery and evading arrest in exchange for the dismissal of carjacking and unlawful driving charges. (*Id.* at pp. 1503-1504.) The report contained witness statements indicating the defendant was not present during the carjacking and had been an unwilling passenger during a later police chase. (*Id.* at pp. 1504-1505.) Noting the "state's suppression of favorable evidence is an extrinsic cause which may overcome the exercise of free judgment," our colleagues in Division Eight of this court held the defendant established good cause to withdraw his plea because the prosecution had ample time prior to the plea to turn over the report. (*Id.* at pp. 1506-1507.)

To be sure, in *Ramirez* the state had suppressed existing evidence that would likely have affected the defendant's willingness to plead; no such misconduct occurred in the case at bar, where the evidence did not come into existence until after the plea. Nevertheless, as the *Ramirez* court explained, "[t]he new information was favorable to appellant and cast the case against him in a different light by significantly weakening the evidence supporting the carjacking charges." (*Ramirez*, *supra*, 141 Cal.App.4th at p. 1506.) Atkins's confession, if credible, had at least as powerful an effect on the residential burglary charge against Jackson. Indeed, here it is clear Jackson resisted admitting his guilt and only reluctantly accepted the plea offer because he felt he had no choice under the circumstances. (See *U.S. v. Garcia* (9th Cir. 2005) 401 F.3d 1008, 1012 ["[l]ike the voluntariness of the plea, a defendant's claim of innocence can clearly be considered in *support* of his motion to withdraw a plea"].) Atkins's confession would very likely have changed that decision—even Darden indicated he would not have

17

advised Jackson to plead had Atkins made his confession earlier.  (Cf. *In re Clark* (1993) 5 Cal.4th 750, 766 [newly discovered evidence is a basis for habeas relief  if "it undermines the prosecution's entire case" and "'casts fundamental doubt on the accuracy and reliability of the proceedings'"].)

> b. *Defense counsel's failure to provide the court with Atkins's declaration was ineffective assistance of counsel*

Both Judge Egerton, who took Jackson's plea and presided over the initial hearings following the filing of his motion to withdraw based in part on Atkins's confession, and Judge Johnson, who ultimately denied the motion, recognized a defendant should be permitted to withdraw a plea if there is compelling evidence of factual innocence.  As Judge Egerton said, "If he's truly innocent—people enter pleas for various reasons—if he's truly innocent, then, obviously, I do not think the plea should stand."  As discussed, however, Judge Egerton had tentatively concluded Jackson was not, in fact, innocent and Atkins's confession was disingenuous, based on her reading of his declaration and her evaluation of the evidence from the preliminary hearing that pointed to Jackson's direct involvement in the burglary.[8]  Although Judge Egerton initially did not see any reason to take testimony from Atkins "because I don't believe Mr. Atkins can explain what the police and a completely independent witness, Miss Parham, saw on April 24th of 2009,"  she ultimately granted defense counsel's request to hear from Atkins so the court could evaluate his credibility.  Due to the court's trial calendar and other time constraints, the matter had to be continued.

By the time the proceedings resumed on the merits of the motion to withdraw, the matter had been transferred to Judge Johnson.  Atkins, who had been in court during earlier proceedings, was not present; and for whatever reason the court had before it only the police report of his confession, not his declaration.  Jackson's new defense counsel also did not have the complete file, which included declarations from both Atkins and Darden, had not heard the audio recording of Atkins's police interview and was unable to

---

[8]     Judge Egerton bluntly stated, "[F]or the reasons I just spent 15 minutes elaborating, I do not think he's innocent at all."

18

provide this additional information to the court. Having only the police report, which questioned Atkins's honesty, the court denied the motion, ruling that sufficiently compelling new evidence of Jackson's innocence had not been shown: "I think the witness would have to testify so I could determine his credibility . . . . It would have to come before me. It's not before me."

Jackson contends defense counsel was inadequately prepared for the hearing on the motion to withdraw his plea and provided constitutionally ineffective representation by insisting Atkins's credibility was not germane and failing to provide the court with the materials necessary to properly evaluate his newly discovered evidence claim. We agree.

"'To establish ineffective assistance of counsel under either the federal or state guarantee, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but for counsel's failings, the result would have been more favorable to the defendant.'" (*In re Roberts* (2003) 29 Cal.4th 726, 744-745; see *Strickland v. Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 80 L.Ed.2d 674].) "'The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant. The proof . . . must be a demonstrable reality and not a speculative matter.'" (*People v. Karis* (1988) 46 Cal.3d 612, 656.)

""'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" [Citations.] "[W]e accord great deference to counsel's tactical decisions" [citation] and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." [Citation.] "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." [Citation.] [¶] In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find

19

ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.'" (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

In denying Jackson's motion to withdraw his plea, the trial court was clearly influenced by the lack of direct evidence from which it could assess Atkins's credibility. Atkins's declaration was such evidence. Defense counsel's failure to know that Atkins's declaration was in the record and to provide it to the court, especially since defense counsel had at least four months to review the record and repeatedly requested that the hearing be continued, fell below an objective standard of reasonableness. It was not a tactical decision, and there could be no conceivable reason for counsel's omission other than oversight.

Within the context of this case, defense counsel's ineffective assistance was prejudicial. Because the decision whether to grant a motion to withdraw a plea pursuant to section 1018 rests within the broad discretion of the trial court (see, e.g., *People v. Wharton* (1991) 53 Cal.3d 522, 585 [trial court's denial of a motion to withdraw a guilty plea will not be disturbed on appeal unless the court's abuse of that discretion is "clearly demonstrated"]), it would be premature for us to determine it is reasonably probable the court would have permitted Jackson to withdraw his plea if Atkins's declaration had been proffered (or if Atkins had been present in court and allowed to testify). What is certain is that Jackson's claim would not have been summarily denied; the court would have evaluated it on the merits, weighed the credibility of Atkins's confession and evaluated it together with the preliminary hearing evidence to decide whether "the ends of justice would be subserved by permitting [Jackson] to plead not guilty . . . ." (*Ramirez, supra*, 141 Cal.App.4th at p. 1507.) Jackson is entitled to that opportunity.[9]

---

9       Although urging we affirm the trial court's denial of Jackson's motion to withdraw his no contest plea, if we remand the case for further proceedings—as we do—the Attorney General contends the trial court should reevaluate Jackson's request on the written submissions without holding an evidentiary hearing. (Cf. *People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 201 ["Petitioner cites no authority specifically requiring courts to hold live evidentiary hearings on section 1016.5 motions or, more generally, on plea withdrawal motions. On the other hand, California law affords

20

# DISPOSITION

The judgment is reversed, and the matter remanded for the trial court to determine whether to conduct an evidentiary hearing on Jackson's motion to withdraw his plea, including taking testimony from Atkins if he is available and willing to testify, or to decide Jackson's motion based on Atkins's declaration and any other supporting documents.

PERLUSS, P. J.

We concur:

ZELON, J.

SEGAL, J.[*]

---

numerous examples of a trial court's authority, in ruling upon motions, to resolve evidentiary disputes without resorting to live testimony."].)  While we agree an evidentiary hearing is not required, because Atkins's credibility is the critical issue, it certainly would be an appropriate exercise of the trial court's discretion to permit Atkins to testify if he is still willing and available, as Judge Egerton had intended, and to review the audio recording of his police interview, which the prosecutor argued demonstrated he was not believable.  The decision how to proceed, however, must be made by the trial court in the first instance.

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.