Filed 3/16/16  P. v. Apodaca CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>MICHAEL JOSEPH APODACA,<br><br>　　　Defendant and Appellant. | F069886<br><br>(Super. Ct. No. PCF296802A)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Tulare County.  Kathryn T. Montejano, Judge.

Shannon Chase, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Gregory B. Wagner, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]　　　Before Kane, Acting P.J., Franson, J. and Smith, J.

Defendant Michael Joseph Apodaca was convicted by guilty plea of first degree residential burglary. His codefendant and wife, Virginia, pled no contest to conspiracy to commit burglary. On appeal, defendant contends the trial court's denial of his motion to withdraw the plea violated his due process rights because his plea was involuntary as part of a coercive package-deal plea bargain. We affirm.

<u>**FACTS AND PROCEDURAL SUMMARY**</u>

The probation officer's report included the following factual summary of defendant's and Virginia's offenses:

> "Reports of the Porterville Police Department indicate on March 17, 2014, at approximately 7:32 p.m., officers were dispatched to Morton Avenue and Conley Street in regards to a cold report of a residential burglary. Upon arrival, officers contacted victims N.P. and R.P., who reported on March 16, 2014, at approximately 4:00 p.m., the suspects, who were later identified as the defendant, Michael Apodaca, and co-defendant, Virginia Apodaca, were digging through the victims' trash cans at the residence they were in the process of moving out from. N.P. indicated she was throwing things away, when the defendants began asking her questions about her moving from the residence.

> "N.P. indicated she left the residence at approximately 11:00 p.m., and returned the next day at approximately 7:45 a.m., and noticed her jewelry was stolen and her back door was open. N.P. advised the jewelry that was stolen was a gold necklace with a cross pend[a]nt worth $500, a gold wedding ring with a diamond in the center worth $500, a gold bracelet worth $1,000, and a gold two finger ring worth $400. N.P. indicated nothing else was stolen and she did not report the incident right away because she did not want to be late for work.

> "N.P. advised she returned to the residence to clean, when her son arrived and told her he saw the defendants walking around the area again. N.P. and her son followed the defendants to Conley Street; however, they lost sight of them and that is when she called the Porterville Police Department. While N.P. and R.P. were waiting for an officer to arrive, they observed the defendants again. [N.P. and R.P.] approached the defendants and asked them to return the jewelry. The defendant reached into his pocket and pulled out a wedding band, double finger ring, and the cross pendant without the necklace. The defendant attempted to give the jewelry

2

back; however, [N.P.] said no because some of the jewelry was missing and she wanted it all back. The defendant ran through the backyard of a nearby residence and [Virginia] walked into the same residence. Officers responded to the residence; however, [the defendants] did not answer the door.

"On March 18, 2014, at approximately 5:50 p.m., a photo line-up was created with the defendant[s'] pictures and both N.P. and R.P. were able to positively identify them. On the same date, at approximately 6:40 p.m., officers were dispatched to the defendant[s'] residence in regards to the defendant threatening to kill Virginia. Upon arrival, Virginia advised the defendant had left the residence. Virginia was arrested due to having an active warrant and transported to the Porterville Police Department for booking. She stated the defendant had the stolen jewelry, and then began to change her story in a manner that did not make sense. She denied knowing anything about the burglary and stated another man stole the jewelry. She continued to cry and not make sense so the interview was terminated. A BOL was issued for the defendant.

"On March 19, 2014, officers located and arrested the defendant. The defendant advised he and Virginia did go to N.P.'s residence to look through the trash and he located jewelry. The defendant then recanted his statement and said he never found jewelry. The defendant continued to change his story and the interview was terminated. The defendant was transported to the Tulare County Main Jail for booking."

On March 20, 2014, the Tulare County District Attorney charged defendant with three felony counts: first degree residential burglary (Pen. Code, § 459;[1] count 1), conspiracy to commit burglary (§ 182, subd. (a)(1); count 2), and receiving stolen property (§ 496, subd. (b); count 3). The complaint further alleged as to all three counts that defendant had suffered three prior strike convictions within the meaning of the Three Strikes Law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). His maximum exposure for a single conviction was therefore at least 25 years to life. (§ 667, subd. (e)(2).)

Virginia was charged in the same complaint with the same three crimes as defendant (counts 4-6); however, no Three Strikes prior strike convictions were alleged

---

[1] All statutory references are to the Penal Code unless otherwise noted.

3

against her.  The prosecutor stated that Virginia's maximum exposure as charged was nine years.

At the preliminary hearing confirmation hearing on March 27, 2014, the prosecution "extended a package deal offer" and the preliminary hearing date was vacated, according to the minute order of the clerk's transcript.  The following occurred:

"THE COURT:  Any questions, [Virginia's counsel]?

"[VIRGINIA'S COUNSEL]:  No, Your Honor.  I talked to my client and she's willing to waive time.  The District Attorney has made an offer.

"[PROSECUTOR]:  The offer will remain open but just for the record, it is a global offer that would have to be accepted by both defendants in order for it to be taken.

"THE COURT:  Okay.  So it's a package offer.

"[PROSECUTOR]:  Yes, Your Honor."

The court then asked both defendant and Virginia if they were willing to waive time for their preliminary hearings and trials.  Both stated they were.

At the change of plea hearing on April 24, 2014, the trial court asked defendant and Virginia if they had any questions.  They said they did not.  The court asked if they understood that (1) some of their counts could be used as prior strikes, (2) their pleas could result in a violation of their probation or parole, (3) their pleas could result in their deportation, (3) their maximum parole period would be three years if they were sentenced to prison, (4) they could be sent back to prison for parole violations, (5) they might be required to pay restitution and fines, and (6) a no contest plea was the same as a guilty plea for sentencing purposes.  They answered yes to each question.  The court then asked, "Other than what I told you regarding the consequences of your plea, has anyone threatened you or promised you anything to get you to enter into this plea?"  They answered no.  The court asked if they had used any medication, alcohol, or drugs that would affect their ability to understand what they were doing at the plea hearing.  They

4

answered no.  The court asked if they (1) had sufficient time to discuss their cases with their attorneys, (2) were satisfied with the service and advice of their attorneys, and (3) had a chance to discuss all the facts and potential defenses of their cases.  They answered yes to each question.  The court asked if they understood and willingly gave up the right (1) to a preliminary hearing, (2) to a trial by court or jury, (3) to present a defense and subpoena witnesses, (4) to confront witnesses, and (5) not to incriminate themselves.  They answered yes to each.  The parties stipulated to the police report as a factual basis of the pleas.  The attorneys stated they had sufficient time to discuss the case with their clients and had advised him or her of the nature of the charges, the consequences of the plea, and any possible defenses.  They believed their clients fully understood these matters.

Defendant then pled guilty to count 1, residential burglary, and admitted one prior strike conviction allegation and a newly alleged prior serious felony conviction allegation (§ 667, subd. (a)) with an indicated sentence of 17 years (six years doubled on count 1, plus a five-year term for the § 667, subd. (a) enhancement).  The district attorney dismissed counts 2 and 3.

Virginia pled no contest to count 5, conspiracy to commit burglary, with an indicated sentence of 120 days in jail.

The trial court accepted the pleas and admissions, finding that both defendant and Virginia had knowingly and intelligently waived their rights in order to enter into the pleas.

On July 14, 2014, defendant filed a motion to withdraw his plea.  (By this time, Virginia was apparently out of custody.)  In his written motion, defendant explained:

> "The Defendant entered a plea of guilty before the Honorable Kathryn Montejano in this case.  Defendant maintains he was coerced into entering a guilty plea.  Specifically, Defendant was informed if he enters a guilty plea, his co-defendant/wife [Virginia] would receive an offer of probation and be released from custody.  Defendant states he was

5

concerned with his wife's health, and felt she needed to be released from custody in order to obtain proper medical care. Defendant states he would not have entered a guilty plea if not for his concern regarding his wife and the promise of her being released soon after the plea."

In the attached declaration, defendant stated:

"1. I am the defendant in this matter.

"2. Through my attorney, I entered a guilty plea in this case.

"3. At the time I entered the no contest [*sic*] plea, I was concerned about my wife's health.

"4. My attorney informed me that if I were to enter a guilty plea, the District Attorney would make an offer to my wife in which she would be released soon after the plea.

"5. My attorney informed me that if I do not enter a guilty or no contest plea, the District Attorney would not make my wife an offer on this case because the offer was a 'package deal.'

"6. I feel the District Attorney was using my wife as leverage against me, in order to force me to enter a guilty plea.

"7. I therefore request leave to withdraw my no contest [*sic*] plea and enter a plea of not guilty, and proceed to trial."

At the July 23, 2014 hearing on the motion, the following occurred:

"[DEFENSE COUNSEL]: Thank you, Your Honor. [¶] Basically, it's all outlined there in the Declaration. He feels that because of his wife's health that he was pressured into pleading guilty, because it was a package deal which was going to result in her being released from custody and being able to seek private medical treatment. And his position is that but for that, he would not have entered a guilty plea—or a no contest plea.

"THE COURT: Alright. Any response from the People?

"[PROSECUTOR]: Yes, Your Honor. In addition to submitting on the Opposition, which we did file, it's the People's position that the Defendant clearly did waive his rights. It was clearly stated on the record when the Court asked him if there were—specifically, I'm looking at Page—lines 8 through 14. It says, 'Other than what I have told you regarding the consequences of your plea, has anyone threatened you or promised you anything to get you to enter into this plea?' The Defendant

6

clearly stated 'No.' There was never talk about having his wife get out for medical treatment. That kind of issue was never brought up before. He clearly did waive all of his rights and emphatically so after being counseled. And on the written opposition, we'll just submit.

"THE COURT: Alright. The Court is reflecting on the portion of the transcript of the plea where the Court specifically asked the Defendant if there were any promises or other inducements that would negate his intent in the plea. [¶] Court stated, 'Other than what I have told you regarding the consequences of your plea, has anybody threatened you or promised you anything to get you to enter into this plea?' And [defendant's] response was 'No.' So the Court is going to be denying the motion. [¶] … [¶]

"(Discussion held off the record between counsel)

"OUT-OF-CUSTODY [VIRGINIA]: That's not true, because I asked to be released. I was lied to.

"THE DEFENDANT: Your Honor, can I have a word? Do I get a chance?

"THE COURT: [Defense counsel], something is going on.

"OUT-OF-CUSTODY [VIRGINIA]: I talked to her. You need to tell the truth about what we talked about.

"(Discussion held off the record between [Virginia's counsel] and Out-of-Custody [Virginia])

"THE COURT: He's trying to speak to the Court and I'm advising him to go through you as his attorney.

"THE DEFENDANT: Virginia, wait.

"(Discussion held off the record between [Virginia's counsel] and Out-of-Custody [Virginia])

"(Discussion held off the record between [defense counsel] and the Defendant)

"THE DEFENDANT: Your Honor?

"[DEFENSE COUNSEL]: Judge, can he address the Court?

"THE COURT: [Defense counsel]?

7

"[DEFENSE COUNSEL]:  Judge, he'd like the Court to reconsider its ruling and he'd like to address the Court.

"THE COURT:  Okay.  Go ahead, sir.

"THE DEFENDANT:  Your Honor, I was under a great amount of duress.  I mean, for me to willingly accept a 17-year sentence, I'm 60 years old in ten days.  That's a death sentence to me, Your Honor.  But my wife, she was limping in court.  She's very unhealthy.  She was denied Mental Health.  I mean, really, you know, I just needed her to get out.  I mean, I'm trying to fight a life sentence.  17 years is a death penalty to me.  It's the same.  I haven't got a chance to even try to fight as long as she was standing next to me limping and them telling me, well, if you don't, she's going to get nine years.  I was under pressure.  When you asked me those questions, I hesitated to answer, you know.  But, you know, she's my wife.  I've been with her for 40 years.  I couldn't see her suffering anymore.

"I mean, all I'm asking for is a chance to defend myself.  We never discussed no kind of defense.  I've never been shown any kind of evidence.  All he said—I haven't received a police report.  I'm not saying my attorney didn't try to do his job.  I'm just saying we never were able to even discuss the offense.  And here I am just willingly accepting a 17-year sentence, Your Honor.  I will be paroled in a pine box, you know.

"So, yes, I was under pressure.  Yes, I was under duress.  No, I wasn't threatened by the Court.  I'm not saying that.  I'm not trying to manipulate nobody, Your Honor.  I'm not that smart.  But I am smart enough to know that if you don't reconsider, it's a death penalty to me.  It's a death sentence.  17 years, 85 percent, Your Honor, that's 15 years from now.  I'll be 75 should I live.

"So with that said, Your Honor, I'm just asking for a chance to withdraw my plea and fight this case.  That's all.  All I know about the case is that it's been filed on me.  And my wife, every time we did come to court, she was dragging her leg.  I mean, she wasn't receiving her medications or nothing like that.  Like I said, she is a Mental Health patient.  She is not physically healthy, you know.  I was trying to help my wife.

"THE COURT:  Alright, sir.  The ruling that the Court made is going to be the final ruling.  The Court is going to deny the motion."

On July 28, 2014, the trial court sentenced defendant to the indicated 17 years.

8

Defendant now contends the trial court abused its discretion by failing to inquire into the coerciveness of the package deal and conduct the mandatory specialized scrutiny of the possible coercive factors, as required by *In re Ibarra* (1983) 34 Cal.3d 277 (*Ibarra*).[2]  He maintains that his plea was coerced by the package deal to secure a favorable sentence for his sick wife and the trial court should have granted his motion to withdraw the plea.

The People counter that the trial court conducted a proper inquiry, specifically asking defendant if anyone had threatened him or promised him anything to get him to enter into the plea.  The People further argue that analysis of the *Ibarra* and other factors establishes that defendant's plea was voluntary.

A motion to withdraw a plea may be granted if there is good cause.  (§ 1018.)  "To establish good cause, it must be shown that defendant was operating under mistake, ignorance, or any other factor overcoming the exercise of his free judgment.  [Citations.]  Other factors overcoming defendant's free judgment include inadvertence, fraud or duress."  (*People v. Huricks* (1995) 32 Cal.App.4th 1201, 1208.)  "A plea may not be withdrawn simply because the defendant has changed his mind."  (*People v. Nance* (1991) 1 Cal.App.4th 1453, 1456.)

"The burden is on the defendant to present clear and convincing evidence the ends of justice would be subserved by permitting a change of plea to not guilty."  (*People v. Shaw* (1998) 64 Cal.App.4th 492, 496.)  "'[T]he withdrawal of such a plea rests in the sound discretion of the trial court and a denial may not be disturbed unless the trial court has abused its discretion.'  [Citation.]  An appellate court will not disturb the denial of a

---

[2]     *Ibarra* was disapproved on another ground in *People v. Howard* (1992) 1 Cal.4th 1132 at pages 1175 through 1178.

motion unless the abuse is clearly demonstrated." (*In re Brown* (1973) 9 Cal.3d 679, 685.)

"It has long been established that guilty pleas obtained through 'coercion, terror, inducements, subtle or blatant threats' are involuntary and violative of due process." (*Ibarra, supra,* 34 Cal.3d at p. 287.) "Such coercion is a particular danger in the package-deal plea bargain context." (*People v. Sandoval* (2006) 140 Cal.App.4th 111, 124-125.) A package deal is an all or nothing proposition; it requires that all codefendants accept the deal. (*Ibarra, supra,* at p. 286.) With a package deal, "[e]xtraneous factors not related to the case or the prosecutor's business may be brought into play. For example, a defendant may fear that his wife will be prosecuted and convicted if he does not plead guilty …. Because such considerations do not bear any direct relation to whether the defendant himself is guilty, special scrutiny must be employed to ensure a voluntary plea." (*Id.* at p. 287.) "[C]ertain factors may appear to render a plea pursuant to a 'package-deal' bargain coercive, or not coercive, upon close examination. Because we believe that it is possible for such a plea to be entered without undue force, we choose not to invalidate all 'package-deal' bargains as coercive per se. Rather, the trial court assumes a duty to conduct an inquiry into the *totality of the circumstances* to determine whether, in fact, a plea has been unduly coerced, or is instead freely and voluntarily given." (*Id.* at pp. 287-288, fn. omitted.) Under *Ibarra*, such an inquiry is *required* whenever a package-deal plea is accepted. (*Id.* at p. 288.)

*Ibarra* recited factors relevant to this inquiry: (1) whether the inducement for the plea was proper, including whether the prosecutor had a reasonable and good faith case against the third party to whom leniency was promised; (2) whether there was a factual basis for the guilty plea and the bargained-for sentence was proportionate to the defendant's culpability; (3) the nature and degree of the coerciveness; (4) whether the promise of leniency to a third party was a significant consideration in accepting the deal; and (5) other factors such as the defendant's age and experience, the party who initiated

the plea negotiations, and whether charges had already been brought against the third party. (*Ibarra, supra,* 34 Cal.3d at pp. 288-290.)

Under the third factor, *Ibarra* explained: "Psychological pressures sufficient to indicate an involuntary plea might be present if the third party promised leniency is a close friend or family member whom the defendant feels compelled to help. '[T]he voluntariness of a plea bargain which contemplates special concessions to another— especially a sibling or a loved one—bears particular scrutiny by a trial or reviewing court conscious of the psychological pressures upon an accused such a situation creates.' [Citation.] If the defendant bears no special relationship to the third party promised leniency, he may nevertheless feel compelled to plead guilty due to physical threat. For example, if the third party had made a specific threat against defendant if he refused to plead guilty, the plea is likely to be involuntary." (*Ibarra, supra,* 34 Cal.3d at p. 289.)

When a trial court fails to inquire into the totality of the circumstances surrounding a package deal, the defendant's plea is not invalid per se. (*Ibarra, supra,* 34 Cal.3d at p. 290.) The plea may not be set aside unless the defendant shows prejudice. He "must allege and prove that his plea of guilty was involuntary under the standards set down in [*Ibarra*] and should not have been accepted by the trial court." (*Ibid.*)

Here, the trial court found that defendant made a knowing and intelligent waiver of his rights to enter into the plea, but the court did not conduct an adequate inquiry into the totality of the circumstances by asking about coercive factors. Attempting now to show prejudice, defendant points to *Ibarra*'s third and fourth factors. Under the third, he argues that the package deal was inherently suspect because it secured the release of his wife of 40 years, who was otherwise facing a nine-year sentence, while allowing the prosecutor to avoid proving a complex case against defendant that included allegations of decades-old prior convictions. Under the fourth factor, he argues that his wife's imminent release was the main and, arguably, the only factor he considered before entering the plea. He contends the totality of the circumstances showed by clear and

11

convincing evidence that he felt compelled to secure his wife's release and entered a guilty plea for that reason alone, out of duress rather than free will.

We turn to an examination of the *Ibarra* factors and any others that appear relevant to coercion. First, the inducement for the plea was proper. The prosecutor did not misrepresent the facts and had a reasonable and good faith case against Virginia, to whom leniency was promised. Virginia was digging through the victims' trash with defendant when they contacted the victim and sought information from her; Virginia was with defendant the next day when he was carrying the victim's recently stolen jewelry near the scene of the crime; Virginia admitted to the police that defendant possessed the stolen jewelry; and then Virginia denied knowing anything about the burglary, claiming another man had stolen the jewelry. Second, the police report provided an ample factual basis to which the parties stipulated, thereby establishing a basis for the pleas. The case against defendant was particularly strong in that he was carrying some of the stolen jewelry on his person shortly after the burglary and near the victims' burgled residence. He produced some of the jewelry for the victim when she confronted him, but he ran away when she said she wanted all of her jewelry. He first told the police he found the jewelry in the victims' trash, then he recanted and said he never found the jewelry. The plea's 17-year term was proportionate to defendant's culpability for a serious felony because he had a criminal past that included three prior strike convictions, which mandated a 25-year-to-life Three Strikes sentence if he had proceeded to trial and been convicted on even one count. Defendant's age and experience with the criminal justice system provided him the insight to recognize the benefit of the bargained-for sentence, which constituted less of a "death sentence" for the 60 year old than the Three Strikes sentence he would have received if convicted at trial. Third, defendant explained in his moving papers and in his statement before the trial court that his plea was coerced. He stated he had accepted the deal only because it provided for his sick wife's release, and he would not otherwise have accepted the lengthy 17-year term because it amounted to a

12

"death sentence" for someone his age. As we have explained, however, other factors strongly suggest that someone in defendant's position would have considered the 17-year sentence preferable to the mandatory 25-year-to-life sentence that would have resulted from a very probable conviction at trial. Thus, although defendant probably did want to secure his wife's release, the package deal that provided that benefit to her also secured for him a more favorable sentence than he would have received if convicted at trial, a likely outcome considering the strong case against him. Defendant's claim that allegations of his prior convictions would be difficult to prove is entirely speculative and finds no support in the record.

Based on our review of the relevant factors, we conclude the trial court did not abuse its discretion in denying defendant's motion to withdraw his guilty plea. Although the court could have concluded defendant was motivated to obtain his wife's release, the court was also justified in concluding defendant voluntarily agreed to a deal that also greatly benefitted him.

## DISPOSITION

The judgment is affirmed.